*Decision will be entered under Rule 50.*

GEORGE H. LANDRETH AND ALICE J. LANDRETH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2976-65. Filed September 4, 1968.

*William Monroe Kerr,* for the petitioners.
*Harold L. Cook,* for the respondent.

Simpson, *Judge:* The respondent determined a deficiency in the petitioners' income tax of $184.92 for the taxable year ended December 31, 1962. The sole issue for decision is whether the petitioner Mr. Landreth constructively received additional income by reason of his having, in effect, guaranteed a loan made by a bank to a partnership which purchased an oil and gas production payment from him in an ABC transaction.

### FINDINGS OF FACT

Some of the facts are stipulated, and those facts are so found.

George H. Landreth and Alice J. Landreth are husband and wife who resided in Midland, Tex., at the time the petition was filed in this case. They filed their income tax returns for the years ending December 31, 1961, 1962, and 1963, using the cash method of accounting, with the district director of internal revenue, Dallas, Tex.

The petitioners were engaged in the oil and gas business, as well as other businesses, during 1961, 1962, and 1963. They owned a portion of the working interest or royalty interest in many oil and gas leases.

Prior to August 1961, the petitioners had acquired an undivided interest in oil and gas leaseholds in the Willis, C. Meek, and Winkleman leases in Midland County, Tex., the Kelly lease in Martin County, Tex., and the Kyle lease in Loving County, Tex. In the summer of 1961, Mr. Landreth entered into discussions with Myron Anderson concerning the sale of these leases. Mr. Anderson was the manager of Petroleum Investors, Ltd. (Investors), a limited partnership engaged in the business of financing oil properties, and was president of Petroleum Associates, Inc., a corporation which was the general partner of Investors. Mr. Landreth was not a partner, and had no interest, in Investors.

As a result of these negotiations, it was agreed that the leases would be sold in an ABC transaction.[1] On August 23, 1961, Mr. Landreth conveyed an undivided half interest in the five leases to Myron Anderson, trustee, who was acting for Thomas M. O'Brien, for $15,000. In this conveyance, he reserved a production payment in the principal sum of $30,000, plus an additional amount equal to interest at the rate

---

[1] In a typical ABC transaction, A, the owner of producing oil and gas leases, sells to B the working interest in such leases for a cash consideration and retains a production payment in a specified dollar amount together with an amount equal to interest on the unliquidated principal balance of the payment. A production payment "is a right to oil and gas in place that entitles its owner to a specified fraction of production for a limited time, or until a specified sum of money (which may be determined by a formula) or a specified number of units of oil or gas has been received." Breeding and Burton, Income Taxation of Oil and Gas Production par. 2.07 (1961). Simultaneously, A sells the retained production payment for a purchase price equal to its principal amount to C, an investor, who finances the purchase by a loan from a lending institution secured by a deed of trust and mortgage on the production payment and an assignment of the income accruing to the production payment.

of 6½ percent per year on the unliquidated balance of the production payment, payable out of 95 percent of all oil, gas, and other hydrocarbons produced from the undivided one-half interest transferred to Anderson. At the same time, Mr. Landreth conveyed the other half interest in the leases to Marvin N. Hime for $15,000. In this conveyance, he also reserved a production payment in the principal amount of $30,000, plus an amount equal to interest at 6½ percent per year on the unliquidated balance of the production payment, payable out of 95 percent of the oil, gas, and other hydrocarbons produced by the half interest transferred to Mr. Hime.

Also on August 23, 1961, Mr. Landreth sold the reserved production payments to Investors for $30,000 each. At this time, Investors was a going business, engaged in the financing of oil properties, and had a net worth in excess of $300,000. To finance its purchase, Investors, on the same day, borrowed $60,000, with interest at 6 percent per year, from the First National Bank of Midland, Tex. (Midland Bank or the bank). Investors gave Midland Bank its note, which matured in 3 years, secured by a deed of trust conveying the two $30,000 oil production payments to C. J. Kelly, trustee, for the benefit of Midland Bank. Although Investors contemplated that the note would be paid off out of the proceeds of the oil accruing to the production payments, its liability on the note was in no way limited.

On August 23, 1961, Mr. Landreth executed and delivered to the Midland Bank an enforceable letter agreement which stated that after a period of 36 months, he would, upon demand by Midland Bank, purchase or find a purchaser for the unpaid principal and accrued interest on the note given by Investors to the bank. The letter provided that the bank would assign its security interest in the production payments to such purchaser. Midland Bank, believing that Investors was a shell corporation with no assets, and being unfamiliar with the purchasers of the working interests who were to operate the leases, would not have made the loan to Investors without Mr. Landreth's takeout letter. However, although Mr. Landreth and Mr. Anderson had, in the preliminary negotiations, discussed a possible guarantee by Mr. Landreth, this matter was dropped prior to the reaching of any agreement as to what properties were to be transferred and on what terms. Investors and Mr. Anderson were unaware, at the time of the transactions and to the date of the hearing in this case, of the agreement between Mr. Landreth and Midland Bank.

All of the documents described above, which were executed on August 23, 1961, stated that they were to be effective as of August 1, 1961, and thus the proceeds of production on and after that date allocable to the production payments were paid over to the Midland Bank to apply on Investors' debt. The gross oil runs, the production

taxes, and the net amount paid to the Midland Bank from the leases are as follows:

| Year | Gross oil runs | Production taxes | Net paid to bank |
|------|------|------|------|
| 1961 | $8,414.66 | $387.07 | $8,027.59 |
| 1962 | 13,417.60 | 617.19 | 12,800.41 |
| 1963 | 10,911.04 | 501.91 | 10,409.13 |

The Midland Bank collected the following amounts as interest on its $60,000 loan to Investors:

| Year | Amount |
|------|------|
| 1961 | $1,388.44 |
| 1962 | 2,493.19 |
| 1963 | 1,605.40 |

In addition to payments made to the bank out of the oil runs, Investors made some payments out of its own funds. Production from the transferred leases fell shortly after the August 23 transactions, the note was not paid off by its maturity date in August 1964, and the bank extended its maturity to August 1965 and then to August 1966. In the latter part of 1964, Midland Bank, at Mr. Landreth's request, returned the takeout letter to him, and absolved him of further liability with respect to the Investors' loan. The bank took this action because it believed its security for the note was adequate and because Mr. Landreth was a good customer whose business the bank wanted to keep.

In late 1965 or early 1966, the purchasers of the working interest, Myron Anderson, trustee, and Marvin Hime, having each realized losses of approximately $30,000 with regard to the properties in the August 1961 transaction, sold their interests in four of the leases to Mr. Landreth for $6,000. The other lease, the Kyle lease, was at the same time sold to a third party, Jack S. Reeves, for $22,250. At about the same time, Investors and the Midland Bank released all the leases except the Kyle lease from the production payment.

During the period 1961 to 1966, Mr. Landreth was financially able to purchase the unpaid principal balance and accrued interest on the Investors' note, but at no time was he called upon to do so, nor did he do so. After the bank returned the takeout letter to him in 1964, Mr. Landreth had no obligation with respect to Investors' note, and there was no understanding that he would protect the bank or Investors from loss with respect thereto.

At the date of the hearing in this case, Investors still held the production payment on the Kyle lease and expected that it would suffer no loss as a result of its transactions with respect to the production payment.

On their 1961 tax returns, the petitioners reported as income a capital gain from the sale of the working interests and production payments in the transferred leases. They reported no income from the production payments in 1962.

In his statutory notice of deficiency, dated March 26, 1965, the respondent gave the following explanation for his determination:

(a) It is determined that the transaction during 1961 wherein you sold interest in oil and gas leases to Marvin Hime and Myron Anderson, Trustee, reserving a production payment of $60,000.00, which you assigned to Petroleum Investors, Ltd., who borrowed $60,000.00 from the First National Bank of Midland as a production payment loan and whereby you guaranteed to find a purchaser of the loan balance at any time the bank requested, constituted one transaction. It is further determined that your guarantee to the bank resulted in your retaining the production payment of $60,000.00 and that income from the production payment constituted taxable income to you. * * *

Because he determined that the petitioners' adjusted gross income for 1962 should be increased, his notice disallowed a portion of the petitioners' claimed deduction for medical expenses.

OPINION

In this case, we have in form an ABC transaction, with embellishments. In the normal ABC transaction, A, the seller, treats as the proceeds from the sale of property what he receives from the sale of the working interest to B and what he receives from the sale of the production payment to C; B reports the income accruing to the working interest, and C reports that accruing to the production payment. See, e.g., *Olin Bryant*, 46 T.C. 848, 857 (1966), affd. 399 F.2d 800 (C.A. 5, 1968). According to the respondent, Mr. Landreth's guarantee of the loan by the bank is an embellishment which changes the nature of the interests created by the transaction. The respondent believes that Mr. Landreth retained the investment risk with respect to the production payment and that therefore under *Anderson* v. *Helvering*, 310 U.S. 404 (1940), and *Estate of H. W. Donnell*, 48 T.C. 552 (1967), on appeal (C.A. 5), the economic interest was not transferred, and the income accruing to the production payment belongs to Mr. Landreth. These arguments by the respondent lead to a reexamination of the tax treatment of the ABC transaction to determine whether Mr. Landreth's guarantee of the loan should cause different rules to apply in this case.

The concept of economic interest, which originated as a test to determine what kinds of income derived from mineral production and sale are subject to depletion (*Palmer* v. *Bender*, 287 U.S. 551 (1933)), correlatively determines who is taxable on that income. *Anderson* v. *Helvering, supra; Thomas* v. *Perkins*, 301 U.S. 655 (1937). In *Thomas* v. *Perkins*, the Supreme Court held that a production payment con-

stitutes an economic interest. In that case, an owner of oil leases transferred them to assignees, reserving from the property transferred a production payment in the amount of $395,000 payable solely out of one-quarter of the oil produced from the transferred leases. The question presented was whether the assignees were required to include in their income proceeds from oil production which they were required to pay over to the assignor on account of the production payment. The Court held that the assignor's retained production payment was a depletable economic interest in the oil in place which never passed to the assignees, and that accordingly, the assignees were not taxable on the proceeds accruing to the production payment.

*Anderson* v. *Helvering* presented a situation which, for present purposes, was identical to that in *Thomas* v. *Perkins*, with one significant exception. There the assignor transferred oil and gas properties to assignees, reserving from the transfer (as the Court found) the amount of $110,000 payable out of one-half of the oil and gas produced *and* one-half the proceeds received from the sale of fee title to any or all of the land conveyed. Again the question was whether the assignees were taxable on proceeds from oil and gas production payable to the assignor pursuant to the agreement. Relying on *Thomas* v. *Perkins*, the assignees argued that the assignor had retained the economic interest in one-half the oil produced so that the assignor rather than the assignees was taxable on the proceeds of that production and was entitled to depletion with respect to that income. The Court rejected this argument, holding that because the assignor's $110,000 could be satisfied not only out of oil and gas production but also out of the proceeds from the sale of land, clearly nondepletable income, the assignees rather than the assignor had the economic interest. For tax purposes, the transaction should be viewed as a sale of the assignor's entire interest in the properties, the purchase price to be paid partly in cash at the time of the sale and partly through deferred payments. The assignees, "as purchasers and owners of the properties," were held "taxable upon the gross proceeds derived from the oil production, notwithstanding the arrangement to pay over such proceeds" to the assignor. (310 U.S. at 413)

A similar situation was recently considered by this Court in *Estate of H. W. Donnell, supra.* In that case, A (Fleming) sold the working interest in an oil and gas lease to B (Donnell) reserving a production payment which he then sold to C (Calm Corp.) for its face amount. C borrowed the purchase price from the bank, giving the bank its note and a deed of trust conveying the production payment to a trustee for the benefit of the bank. At the same time, B executed a letter in favor of C and the bank, by which he agreed that if requested by the holder of the production payment or of the note, he would purchase the same for the unliquidated balance. This takeout letter was given

as an inducement to C to purchase the production payment from A and as an inducement to the bank to make the loan to C. The issue was whether B was taxable on the production payment income by reason of his obligations under the takeout letter. This Court held that he was so taxable on the authority of *Anderson* v. *Helvering*. We there said:

In short, the guaranty was part and parcel of the production payment. As payments were made on the oil production payment, any possible liability of Donnell was reduced with regard to it. Since Calm Corp. (or Texas Bank & Trust Co.) did not have to look merely to oil production for satisfaction of the oil payment, but instead could look to the personal guaranty of Donnell, we think this situation comes within the ambit of the *Anderson* rationale. * * * In a true production payment situation the owner must look for his security only to production from the properties from which the payment is carved. Agreements imposing a personal and absolute liability to pay, although indicating production as the source from which payment is to be made, are not true production payments but are like mortgages of property for the purpose of securing a loan. * * * [48 T.C. at 568]

The respondent argues that his position in the present case is supported by *Anderson* and *Donnell*. As he views the facts, Investors was a mere strawman, and that Midland Bank was the real holder of the production payment. Since Mr. Landreth guaranteed the loan by the bank, the owner of the production payment had additional security. Therefore, he reasons that *Anderson* and *Donnell* apply; that since the holder of the production payment had additional security, no economic interest was transferred by Mr. Landreth to Investors or the Midland Bank; that the investment risk remained with Mr. Landreth, and the income accruing to the production payment belonged to and is taxable to him.

Contrary to the respondent's contention, we conclude that the ownership of, and the economic interest in, the production payment passed to Investors as a result of the transaction. After the transfer, Investors bore the ultimate risk of loss from failure of production from the transferred leases to satisfy the production payment. In the first place, Investors was not a mere strawman; there was uncontradicted testimony, and we have found, that Investors had a net worth of greater than $300,000 in August 1961. Investors' liability on its note to the Midland Bank was general—it was not limited to the production payment. Although the Midland Bank agreed to make the loan without realizing that Investors had substantial assets, the bank actually had a meaningful right to shift any loss on the production payment to Investors.[2]

[2] Our reasoning and holding herein are based on our factual determination that Investors was a financially responsible party. Had Investors been a shell, we would have a different case, as to which we express no views at this time.

It is true, as the respondent points out, that if the Midland Bank found its security interest in the production payment insufficient to protect itself from loss on its loan to Investors, it could look to Mr. Landreth to fulfill the terms of his takeout letter. However, the fact that Mr. Landreth might have a guarantor's obligation to the Midland Bank is not sufficient to establish that he had the economic interest in the production payment. Having purchased the note, Mr. Landreth, or someone found by him pursuant to the terms of the takeout letter, would step into the shoes of the Midland Bank as a creditor of Investors, and have a right against Investors for the unpaid balance plus interest on the note. In view of the facts that the purchaser of the note would have a right against Investors and that Investors had sufficient net worth at the time of the transactions to make the right meaningful, we find that the takeout letter did not cause the economic interest to remain with Mr. Landreth; the investment risk lay upon Investors. The respondent urges that Mr. Landreth intended to bear the risk of loss himself. However, there is nothing in the record to indicate that, if he had to fulfill his obligations under the takeout letter, he would not have fully exercised his rights against Investors. The respondent contends that the *Midland Bank* intended to look to Mr. Landreth in the event that the oil runs were not sufficient to cover Investors' obligation under the note, but in view of Mr. Landreth's right of subrogation against Investors, the existence of any such understanding is immaterial.

When the facts of this case are viewed properly, *Anderson* and *Donnell* are inapposite. In *Anderson*, the question was whether separate interests in property had been created—a working interest, and an interest in the production payment. Since the Court found that the holder of the production payment had rights in addition to the interest in the oil in place, it held that the production payment did not constitute a property interest. The Court said:

In the interests of a workable rule, *Thomas* v. *Perkins* must not be extended beyond the situation in which, as a matter of substance, without regard to formalities of conveyancing, the reserved payments are to be derived solely from the production of oil and gas. * * * [310 U.S. at 413]

In the present case, however, there is no question but that a production payment, one which satisfies the requirements of *Perkins*, was created on Mr. Landreth's sale of the working interest. Our question then is not the question presented in Anderson; it is instead whether the income therefrom is to be taxed to its creator and original owner, Mr. Landreth, or to his purported transferee, Investors. *Anderson's* holding, therefore, has no relevancy in determining whether the purported sale by Mr. Landreth of the production payment to Investors was effective to transfer the economic interest.

The respondent appears also to be arguing that *Anderson* applies to this case by analogy. He apparently relies upon *Anderson* as standing for the more general proposition that a transfer of an interest in oil and gas property is ineffective when the investment risk is not transferred. However, as we have shown, Investors bore the ultimate risk of nonproduction; the recovery of their investment depended solely on production. The petitioners accurately described Investors' rights when they said:

> The holder, of course, is Petroleum Investors, Ltd. There is nothing and no one it can look to besides the oil and gas runs to satisfy the production payments, and if they are insufficient, either in total amounts or in amounts of daily production, its only remedy is to mumble to itself until it has completely exhausted that remedy. [Petitioner's brief 8]

Thus, even if *Anderson* stands for the general proposition, it supports our conclusion since there was a transfer of the investment risk.

In *Donnell*, the issue was also different. In that case, in addition to the holder of the production payment having additional security for his investment, the additional security was provided by the purchaser of the working interest who would also ultimately become the sole owner of the property. These facts led the Court to conclude that the transaction very much resembled a purchase of the entire property by Donnell with a mortgage loan. However, in our case, it is not the production payment that is guaranteed, but the loan by the bank; and the guarantee is given by the seller of the property, not by the purchaser of the working interest who will ultimately become the owner of all the property. These differences are material, for in this case there is no reason to find that the transaction resembles a purchase on credit. Compare *Thomas* v. *Perkins*, *supra* at 663 (Stone and Cardozo, *JJ.*, dissenting); note, "ABC Transactions—Enforceability of an Undisclosed Guarantee of the Production Payment," 18 Stanford L. Rev. 925–927 (1966); Note, "Taxing the ABC Transaction: A Suggested Approach," 114 U. Pa. L. Rev. 602–614 (1966). Consequently, *Donnell* is inapplicable.

The inapplicability of *Anderson* and *Donnell* to this situation was also indicated by the recent decision of this Court in *Estate of Ben Stone*, 50 T.C. 113 (1968). That case involved a variant of the ABC transaction, the ACB transaction. A (Halbouty) sold undivided interests in oil and gas leases and in equipment used in working the leases to C (Scripps), who financed the bulk of the purchase price through a bank loan. As security, the bank took a deed of trust on all of the property acquired by C in the transaction. C then sold the working interest to B (Sango), retaining a production payment. The respondent took the position that B was taxable on the production payment income. He argued that C was a strawman and that the—

production payment ran from Sango to the bank and that the existence of the deed of trust [which covered property other than production payment oil] gave rise to an additional security which under the rule of *Anderson* v. *Helvering*, * * * prevented the production payment from being a depletable economic interest. * * * [50 T.C. at 123]

However, the Court found that the respondent, who had the burden of proof in that case, had failed to prove that Scripps lacked substance. It held that the purchaser of the working interest was taxable only on the income accruing to that interest, notwithstanding that the bank had a lien against the entire property to secure its loan.

The issue in this case may also be stated as whether or not the purported transfer of the production payment to Investors was in substance a "sale." We have found that, as a result of the transaction, the investment risk was transferred to Investors. Mr. Landreth received full payment for the sale of his interest. He did guarantee the loan and as a result incurred some risks, but those risks were not significantly different from those he would have retained had he sold the production payment on credit; that is, had Investors paid for the production payment by giving Mr. Landreth its demand note for the purchase, secured by the production payment and Investors' personal liability, Mr. Landreth would have been exposed to at least as much risk as he actually was, acting as guarantor for the bank. Yet, it would follow *a fortiori* from *Commissioner* v. *Brown*, 380 U.S. 563 (1965), that such a sale on credit would be recognized as a sale for tax purposes. The seller in such a case would have greater security, and therefore less risk, than the seller in *Brown*. As the credit sale would be recognized for tax purposes, so should the sale actually before us. *Brown* requires us to hold that this sale was effective.

There is in the respondent's brief a suggestion that he would tax Mr. Landreth on the production payment income simply because the takeout letter did guarantee the bank's loan. His theory appears to be that because, by reason of the guarantee of the loan to Investors, Mr. Landreth's assets were subjected to a contingent $60,000 liability to the bank, that as payments were made to the bank from the oil runs this possible liability was reduced, and that Mr. Landreth correspondingly received income. If by this argument the respondent intended to suggest that because of the seller's guarantee, the sale of the production payment should not be recognized for tax purposes, we do not agree. Under *Commissioner* v. *Brown*, it is clear, as we have already shown, that the assumption of such a guarantee by a seller does not vitiate the sale.

If the respondent intends to suggest that any person who guarantees the payment of a loan realizes income when the principal debtor discharges the loan, we reject the proposition. The respondent cites, and we have found, no authority for the proposition that a guarantor

constructively receives income when the debtor makes payments to the creditor on his obligation, and we think that it has no foundation in the principles of the tax law. The situation of a guarantor is not like that of a debtor who as a result of the original loan obtains a nontaxable increase in assets. The guarantor obtains nothing except perhaps a taxable consideration for his promise. Where a debtor is relieved of his obligation to repay the loan, his net worth is increased over what it would have been if the original transaction had never occurred. This real increase in wealth may be properly taxable. *United States* v. *Kirby Lumber Co.*, 284 U.S. 1 (1931). However, where the guarantor is relieved of his contingent liability, either because of payment by the debtor to the creditor or because of a release given him by the creditor, no previously untaxed accretion in assets thereby results in an increase in net worth. *Commissioner* v. *Rail Joint Co.*, 61 F.2d 751 (C.A. 2, 1932); *Fashion Park, Inc.*, 21 T.C. 600 (1954). Payment by the principal debtor does not increase the guarantor's net worth; it merely prevents it, pro tanto, from being decreased. The guarantor no more realizes income from the transaction that he would if a tornado, bearing down on his home and threatening a loss, changes course and leaves the house intact. Since we have found that, in substance as well as in form, Investors and not Mr. Landreth was the principal debtor on the note, payments made to satisfy that loan out of the production payment income are not taxable to Mr. Landreth as guarantor.

Because we have found that the petitioners did not err in failing to report the production payment income on their return, we also hold for the petitioners on the resulting issue concerning the medical expense deduction.

*Decision will be entered for the petitioners.*