FINLEY W. HOLBROOK AND FAITH HOLBROOK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2475-66. Filed August 20, 1970.

*Wm. Monroe Kerr*, for the petitioners.
*John W. Dierker*, for the respondent.

#### OPINION

TANNENWALD, *Judge:* Respondent determined deficiencies of $3,263.45 and $4,314.79 in petitioners' income taxes for the years 1963 and 1964, respectively. The only issue remaining for our determination is whether petitioners constructively received taxable income of $7,579.51 and $3,356.07 in the years 1963 and 1964 derived from an oil and gas production payment made to a third party because petitioner Finley W. Holbrook guaranteed the payment of a loan by a bank to the third party to finance the purchase of the production payment.

All of the facts have been stipulated and are found accordingly.

Petitioners are husband and wife who had their legal residence in Midland, Tex., at the time of filing their petition herein. They filed joint Federal income tax returns for the years 1963 and 1964 with the district director of internal revenue, Dallas, Tex. Faith Holbrook is a party hereto only because she filed such returns with her husband. Reference to petitioner shall be deemed to refer to Finley W. Holbrook.

During December 1962, Ecland Oil Participation Corp. (hereinafter Ecland) executed and delivered to petitioner a conveyance of undivided interests in oil, gas, and other minerals and leasehold interests therein, reserving to itself a production payment in the principal sum of $34,857.43, payable out of 80 percent of all oil, gas,

and other hydrocarbons produced from the interests assigned, plus an additional amount equal to interest at the rate of 6½ percent per year on the unliquidated balance of the production payment.

At the same time, Ecland executed and delivered to G & W Oil Corp. (hereinafter G & W) a conveyance of the production payment received by Ecland in the transaction with petitioner.

Simultaneously with the foregoing transactions, G & W executed and delivered to C. J. Kelly, trustee for the First National Bank of Midland, Tex. (hereinafter First National), a deed of trust covering the production payment conveyed to G & W by Ecland to secure a negotiable note in the principal amount of $34,512.31, with interest at 6 percent per year and payable on or before December 15, 1963, in 11 monthly installments. Petitioner also executed and delivered to First National a so-called take-out letter, which provided that, in consideration of First National's loan to G & W, petitioner would locate a purchaser or would himself purchase G & W's note to First National within 10 days of receipt of the latter's demand. This provision became effective at the expiration of not less than 12 months after the date of the take-out letter and specified that the purchase price would equal the unpaid principal of the note plus all accrued but unpaid interest. The letter provided that First National would assign its security interest in the production payment to such purchaser.

The production payment reserved by Ecland was paid in full prior to October 31, 1964, whereupon G & W and First National executed releases reflecting the satisfaction of the payment obligation and the deed of trust, respectively. All payments made in satisfaction of the production payment were paid to First National for credit to the account of G & W.

On an undetermined date, between the time that petitioner executed the take-out letter and the time when G & W's note to First National became fully paid, First National redelivered the take-out letter to petitioner and thereafter regarded it as of no force and effect.

At no time have petitioners, individually or jointly, had any ownership or proprietary interest in G & W.

We are required to determine the tax consequences flowing from a variant of the so-called ABC transaction. In the normal ABC transaction, A, the seller, treats as the proceeds from the sale of property the consideration from the sale of a working interest to B and the sale of a production payment to C; B reports the income attributable to the working interest, and C reports that income attributable to the

production payment.[1] See *Olin Bryant*, 46 T.C. 848, 856–857 (1966), affd. 399 F. 2d 800 (C.A. 5, 1968 ) ; "Taxing the ABC Transaction : A Suggested Approach," 114 U. Pa. L. Rev. 588 (1966).

The question herein is whether the presence of the guaranty of petitioner of the note of G & W (C) to First National requires the conclusion that petitioner (B) had an economic interest in the oil and gas payment. If, as respondent contends, he had such an interest, then petitioner (B) rather than G & W (C) is taxable on the income attributable to the production payment.

Respondent asserts that this case is controlled by *Estate of H. W. Donnell*, 48 T.C. 552 (1967), affirmed on this issue 417 F. 2d 106 (C.A. 5, 1969). Petitioner, on the other hand, argues that *George H. Landreth*, 50 T.C. 803 (1968), compels a decision in his favor.

In *Donnell*, the person in the position of petitioner herein (B) had guaranteed against loss both the holder of the production payment (C) and the person from whom C had borrowed the funds. We concluded that both C and the lender were absolved from any risk of loss and that such risk devolved entirely on B. As a consequence, we held that B had an economic interest in the production payment and was taxable on the income attributable thereto. In this case, the guaranty against loss executed by petitioner (B) ran only in favor of First National, which loaned the funds to G & W (C), and did not extend to the latter. It thus appears that if petitioner (B) were called upon to make good on his guaranty, he would be subrogated to the rights of First National and would be entitled to seek reimbursement from G & W. Cf. *George H. Landreth, supra*. Compare also *Robert E. Gillespie*, 54 T.C. 1025 (1970) ; *J. Meredith Siple*, 54 T.C. 1 (1970). Such being the case, we cannot agree with respondent that *Donnell* is determinative herein.

In *George H. Landreth, supra*, we determined that the taxpayer-seller (A) was not taxable on account of the income derived from the production payment sold to C, by virtue of A's agreement, identical in substance to that involved in this case, running to the bank which loaned money to C to finance the purchase of the production payment. In determining that Landreth did not retain an economic interest in the production payment, we pointed out that it was the seller (A) and not the purchaser (B) who executed the guaranty of the loan against the production payment. But we also emphasized that C was a finan-

---

[1] See sec. 636, I.R.C. 1954, altering the tax consequences of the ABC transaction, added by sec. 503, Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 487 ; H. Rept. No. 91–413, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 200, 286–291 ; S. Rept. No. 91–552, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 423, 538–541 ; Conf. Rept. No. 91–782, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 644, 666.

cially responsible party with sufficient net worth to meet its note obligation to the lender bank,[2] that the taxpayer's guaranty ran only to the holder of the note and not to the owner of the production payment, and that the additional security was not provided by the purchaser of the working interest, who would ultimately become the sole owner of the property. See 50 T.C. at 809-811. Thus, while we agree with petitioner that the fact that it was the seller (A) who executed the guaranty in *Landreth* was not the sine qua non of our decision, we do not agree that it is controlling herein.

Since neither *Donnell* nor *Landreth* is precisely apposite, we turn to the underlying issue which the parties herein have posed. Should we, as petitioner contends, determine the existence of an economic interest solely on the basis of the legal obligations created by the documents? Compare the so-called "policy facts" principle enunciated in the estate tax field. *Commissioner* v. *Noel Estate*, 380 U.S. 678 (1965); *United States* v. *Rhode Island Hospital Trust Co.*, 355 F. 2d 7 (C.A. 1, 1966); *Estate of Bert L. Fuchs*, 47 T.C. 199 (1966). Or should we, as respondent contends, look to the financial responsibility of G & W (C) in order to determine whether petitioner (B), by virtue of his guaranty, bore the ultimate risk of loss in an economic sense? This is the question we left open in *Landreth*. See fn. 2 *supra*.

Unquestionably, the existence of an economic interest in mineral properties depends upon substance, not form, with the economic realities of the particular situation a critical consideration. Cf. *United States* v. *Cooke*, 399 F. 2d 433 (C.A. 5, 1968); *Callahan Mining Corp.*, 51 T.C. 1005 (1969), affd. 428 F. 2d 721 (C.A. 2, 1970). In the instant case, beyond the bare stipulation that neither of the petitioners, individually or jointly, had any ownership or proprietary interest in G & W, we have no evidence whatsoever as to whether G & W had an interest in the transactions involved herein substantively independent of the interests of First National or petitioner. Cf. *Estate of Ben Stone*, 50 T.C. 113, 123–124 (1968). Nor do we have any evidence that it had any assets at all which might have provided some content to petitioner's legal right of subrogation. Concededly, the evaluation of financial responsibility in the broad sense of ability to pay *is an extremely troublesome one, and the applicability of such a criterion*[3] would, in any event, have limited applicability in

---

[2] The Court in *Landreth* refrained from expressing any view if C had been a shell that was not financially responsible. See 50 T.C. 803, 809 fn. 2.

[3] We note that the determination of financial responsibility may not be coextensive with a finding of the solvency or insolvency of the holder of the production payment nor with a finding that said holder was a strawman, i.e., a shell or alter ego of another party to the ABC transaction.

light of recent legislation.[4] How far we should go in this direction, we leave to resolution at a later date, if that should become necessary. For the purposes of this case, it is sufficient to note that petitioners have not even attempted to satisfy their burden of proof as to ultimate risk of loss with a minimal amount of evidence [5] (*Welch* v. *Helvering*, 290 U.S. 111 (1933); Rule 32, Tax Court Rules of Practice), although it is apparent from the oral argument at the time of submission of the case and petitioners' original brief that their counsel was well aware of the existence of the issue of economic reality.

We cannot on the record before us conclude that petitioner did not bear the ultimate risk of loss.

*Decision will be entered for the respondent.*

---

[4] See fn. 1 *supra*.

[5] We do not consider the bare stipulated facts that the production payments were completed by Oct. 31, 1964, or that the take-out letter was returned at an undetermined date prior thereto as sufficient to sustain that burden.

