The **PRODUCERS SUPPLY & TOOL COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 4–1415.

United States District Court,
N. D. Texas,
Fort Worth Division.
Sept. 10, 1971.

Fred A. Sanders, Fort Worth, Tex., for plaintiff.

Ben A. Douglas, Tax Div., Dept. of Justice, Dallas, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT M. HILL, District Judge.

### I. INTRODUCTION

The Producers Supply & Tool Company instituted this lawsuit against the United States for a tax refund. In its answer the Government asserted a setoff to Producers' claim. The setoff challenged the validity of an ABC oil and gas transaction entered into by Northwest Oil Company, a subdsidiary of Producers. The parties have since disposed of the issues raised in Producers' complaint; only the issues raised in the setoff remain.

Jurisdiction is conferred by 28 U.S.C. § 1346(a) (1) and venue properly lies in this Court by virtue of 28 U.S.C. § 1402. The case was submitted to the Court without a jury on largely stipulated facts.[1]

An ABC transaction is a method of financing the purchase of oil and gas producing properties. In a typical transaction, A sells producing mineral properties to B, but A reserves production payments from the mineral properties. B pays A cash for the mineral properties. A sells his reserved production payments to C. C finances the purchase from A by obtaining a loan from a lending institution. To secure the loan, C pledges the production payments he purchased from A.

In typical ABC transactions C is liable for payment of taxes on the reserved production payments. The issue in this case is whether certain events occurring after the sale of the mineral properties

---

1. Sol Brachman testified briefly before the Court.

should make B, rather than C, liable for these taxes.[2]

The A members of the ABC transaction involved in this case are H. L. (Cy) Perkins and his brothers.

The B member of the transaction is Northwest Oil Co., a Texas corporation. Producers Tool is the parent of Northwest and is the proper party to this suit.[3] During 1964 and 1965, the years relevant to this suit, approximately 70% of the outstanding stock of Producers was owned by the Brachman family. Sol Brachman was the president and majority shareholder of Producers, owning between 30% and 40% of its outstanding stock. Sol Brachman's son, Malcolm K. Brachman, was the president of Northwest.

The C member is Fort Worth Enterprises, a Texas corporation. All the outstanding stock of Enterprises is owned by the law firm representing Producers in this case.

## II. FACTS

H. L. Perkins and his brothers, A, owned extensive working interests in oil and gas properties located in Texas and Oklahoma. On August 30, 1956, they sold these working interests to Northwest, B, for $300,000. They reserved production payments in the primary sum of $2,200,000, plus interest, to be paid from 80% of the production from these leases.

On the same date Perkins conveyed the reserved production payments to Enterprises, C, for $2,200,000. Enterprises paid Perkins $550,000 in cash and gave two notes totalling $1,650,000 for the remainder. Enterprises borrowed the cash from the Republic National Bank in Dallas, Texas, and executed a note to the bank with a lien on the first $550,000 of the production payments as

security for this loan. One of the notes given Perkins was for $900,000 (Installment Note First); the other was for $750,000 (Installment Note Second). These notes were secured by a lien on the last of the production payments. As production payments were received by Enterprises they were applied on its indebtedness to the bank.

On September 16, 1957, Enterprises borrowed another $550,000 from the bank. This sum was paid to Perkins and credited on the Installment Note First. Perkins simultaneously assigned $550,000 on his lien on the last of the production payments to the bank as security for this loan.

On September 1, 1958, Enterprises borrowed $500,000 from the bank. Enterprises again paid this amount on the note owed to Perkins.

On this date Northwest and Enterprises agreed to reduce the percentage of production from which the production payments would be paid from 80% to 65%. This change resulted in an extension of the time required to complete the production payments. The bank agreed to this change, but requested and received a "takeout" letter as additional security on its loan to Enterprises. Sol Brachman and Malcolm K. Brachman delivered the takeout letter to the bank in which they agreed to find a third party purchaser of the last $375,000 of Enterprises' indebtedness to the bank. The letter stated that the Brachmans would obtain the third party on the bank's demand any time within three years. The letter obligated the Brachmans to pay the last $375,000 of Enterprises' indebtedness to the bank if no third party purchaser was found.

The loan transaction described above was repeated several times after 1958. On some of these occasions takeout let-

2. Most of the federal income tax advantages of ABC transactions were terminated by Section 503 of the Tax Reform Act of 1969, P.L. 91–172, 83 Stat. 487. The new rules apply to production payments created after August 6, 1969, and are not applicable in this case.

3. Producers and Northwest filed a consolidated income tax return during 1964 and 1965.

ters similar to the one of September 1, 1958, were delivered to the bank. The date, takeout amount, maker and obligation period of each letter follows:

| Date | Amount | Maker | Period |
|---|---|---|---|
| Sept. 1, 1958 | $300,000.00 | Sol & Malcolm | Three Years |
| Aug. 29, 1960 | $300,000.00 | Sol & Malcolm | To Dec. 1, 1961 [4] |
| Oct. 1, 1961 | $208,041.77 | Sol | Four Years |
| Jan. 2, 1963 | $375,000.00 | Sol | Three Years |

Each time a letter was delivered to the bank the indebtedness of Enterprises exceeded the takeout amount. After the January 2, 1963, letter, the Brachmans did in fact secure a third party pursuant to that letter. On January 5, 1963, Milton and Herman Lurie, financially solvent parties, agreed to purchase Enterprises' last $375,000 of indebtedness to the bank if called upon to do so.

Production payments eventually satisfied Enterprises' indebtedness to the bank in full, and neither the Brachmans nor the Luries were ever called upon to perform under any of the takeout letters.

### III. OPINION

The Court must first decide the nature of the takeout letters. Sol Brachman testified that the bank's insistence on the takeout letters was merely to meet periodic examination by governmental banking authorities. Several facts lead the Court to believe that the bank relied on the takeout letters as security.

First, it seems the Brachmans would not have bothered to secure a third party if the takeout letters were, as Sol Brachman stated, merely to meet certain banking examinations.

Second, it is clear that Enterprises is a "dummy" corporation. This is substantiated by the fact that Enterprises' net worth (paid in capital plus earned surplus) never exceeded a yearly high of $28,220.77 during the nine-year period beginning June 30, 1957.[5] It thus seems reasonable that the bank would require additional security on its loans and that the takeout letters would be considered such security.

Finally, the bank's records clearly indicate that these letters were treated as security on the loans to Enterprises. For example, an interoffice memo referred to the August 29, 1960, takeout letter as "collateral behind the Fort Worth Enterprises, Inc.—Northwest Deal debts."

The Court concludes that the takeout letters were security for the loans and renewals which were made on and after September 1, 1958, by the bank to Enterprises, and that such loans and renewals would not have been made except for the execution and delivery of such letters.

The Government contends that all income from production payments obtained after the initial takeout letter should be taxed to Producers, B, rather than Enterprises, C. The Government's reasoning is that because the bank did not have to look solely to C's production payments to satisfy C's indebtedness, but could look to B's principal stockholders, then B should be liable for the tax on the income. In contravention, Producers makes four arguments:

A) The initial ABC transaction was legitimate, and the validity of that transaction could not be altered by subsequent takeout letters.

---

4. This letter was returned to the Brachmans by the bank on August 31, 1961.

5. Enterprises showed a deficit net worth during four of the nine years the ABC transaction involved in this lawsuit was in effect.

B) Assuming the ABC transaction was validly altered, the takeout letters did not destroy Enterprises' economic interest in the production payments.

C) Because tax liability must fall on the bearer of the risk of loss, the Brachmans or Luries, not Producers, are liable for the tax in this case.

D) The takeout letter of January 2, 1963, was limited to $375,000. Enterprises thus owns a true economic interest on any production payment exceeding $375,000.

The Court concludes the Producers' first three assertions are without merit, but agrees with Producers' fourth assertion in part.

## A. The takeout letters did affect the ABC transaction

Producers first argues that the rights and liabilities of the parties were established in 1956, the date of the initial ABC transaction, and could not be altered by the takeout letters, the first of which was written in 1958.

It is axiomatic that parties may alter their rights under a contract. The parties to this transaction altered their initial rights under the contract on September 1, 1958, when they agreed that the percent of production from which production payments would be payable was reduced from 80% to 65%. The takeout letters were an integral part of this change.

In short, there was a different agreement in effect after September 1, 1958, and the ABC transaction must be considered in light of this later agreement. Producers' first contention is without merit.

## B. The takeout letter shifted the risk of loss from Enterprises, C, to Producers, B.

Producers next asserts that the takeout letters, though valid contractually, did not shift the economic interest of C in the production payments and that the ABC transaction is thus valid. A brief examination of statute and case law is

necessary to decide the merits of this assertion.

Section 611 of the Internal Revenue Code of 1954, 26 U.S.C. § 611, allows deductions for depletion of mineral deposits. Applicable Treasury Regulations on Income Tax (1954 Code) § 1.611–1(b)(1), provide that depletion deductions are to be allowed only to the owner of an economic interest in the mineral deposits. The statute provides that an economic interest is present in those cases in which the taxpayer has acquired by investment any interest in minerals and secures, by any form of legal relationship, income derived from the extraction of the minerals, to which he must look for a return of his investment.

The tax advantages of an ABC transaction were sustained in the landmark case of Thomas v. Perkins, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324 (1936). The Supreme Court held that where oil and gas leases were sold by a seller who reserved an estate consisting of production payments payable from the leases, then the seller, rather than the purchaser, owned an economic interest in the oil and gas produced if he could look only to such oil and gas for the production payments. The income is attributable to the seller for both income and depletion allowance purposes. It is only in those cases where mineral production is not the sole source of production payments that the tax benefits arising from the holding in the *Thomas* case are abrogated.

For instance in Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277 (1939), the seller reserved production payments which were payable both from oil and gas production and from any sale of the fee title. The Court held that since the production payments were not payable solely from oil and gas, but might be satisfied from other sources, i. e., the sale of the fee, then the seller did not own an economic interest in the production payments. The buyer in *Anderson* was required to report the production payments as his income. The situa-

tion was equated to that of the buyer giving a personal guarantee that production payments would be paid.

The Fifth Circuit requires a taxpayer to look solely to the extraction of oil or gas for a return of his capital to claim ABC tax benefits. C.I.R. v. Estate of Donnell, 417 F.2d 106 (5th Cir. 1969); Christie v. United States of America, 436 F.2d 1216 (5th Cir. 1971). In *Donnell* takeout letters were given to the bank by B to both A and the bank; in *Christie* proceeds from the sale of oil field equipment could be used to satisfy production payments. In both these cases the tax advantages of a valid ABC transaction were denied.

Producers argues that the Tax Court's decision in Landreth v. C.I.R., 50 T.C. 803 (1968), supports its position in this case that the economic interest did not shift despite the Brachmans' takeout letters. In *Landreth* the bank made loans to C, who purchased A's production payment. A gave the bank a takeout letter to secure C's loan. The Tax Court upheld the ABC transaction despite the takeout letter, emphasizing that the considerable assets of C, which were five times the amount owed to the bank at any time, made C the party ultimately liable. The Court reasoned that A would gain the bank's subrogation rights if called to perform under the takeout letter. Because A could then look to C, and since C was financially solvent, C would ultimately have to pay the debt.

The Tax Court limited *Landreth* in Holbrook v. C.I.R., 54 T.C. 1617 (1970). In *Holbrook* the C party was a dummy corporation incapable of meeting its obligations to the bank, and the B party authored a takeout letter guaranteeing payment of C's indebtedness. The Tax Court denied ABC tax benefits, basing its decision on the fact that C lacked sufficient assets to pay its indebtedness to the bank or to a party acquiring the bank's rights through subrogation. Because C lacked these assets, the risk of loss shifted from C to B when B wrote the takeout letter.

The Court feels that the *Landreth* exception is not applicable here because the C in this case, Enterprises, was a dummy corporation and lacked the assets necessary to pay its indebtedness if production payments failed. Therefore the Brachmans' takeout letters shifted the risk of loss in this case from the minerals in place. The risk of loss to the extent of $375,000 no longer rested on Enterprises after January 2, 1963, and Enterprises' economic interest in the production payment was destroyed to this extent. Producers' second contention is without merit.

### C. Producers, B, not the Brachmans or Luries, is liable for the tax in this case.

Producers' third contention concerns the authorship of the takeout letter. Producers argues that if C is not liable for the tax on production payments, then the authors of the takeout letters, Sol Brachman or the Luries, should be liable for the taxes.

It is to be remembered that an ABC transaction is essentially a device by which two parties, A and B, enjoy tax benefits at the expense of C. If an ABC transaction is invalid, it seems equitable that A or B should be required to bear the tax burden that C would ordinarily bear. In the cases discussed above, either A or B was responsible for any takeout letters that were written and were thus automatically liable for taxes.

The tax liability of a third party author of a takeout letter has never been decided. The Court finds it unnecessary to reach this issue, however, because the takeout letters in this case were not written by third parties as the result of arm's length transactions. Sol Brachman, it is to be remembered, was the majority stockholder of Producers, and the takeout letter he wrote directly benefitted his company. The fact that Brachman later obtained additional third parties—the Luries—is not sufficient to cure the self-serving motive behind his original letter.

The Brachmans and Luries were personally liable to the bank on their takeout letters. This does not mean that these parties should be held liable for the taxes involved in this case, however. For tax purposes only, this Court attributes Sol Brachman's takeout letter to Producers, and holds Producers liable for the tax in this case.

The Court notes in passing that the statute of limitations has run against both the Brachmans and Luries, and a ruling that these are the proper parties would eliminate, not transfer, tax liability in this case. The Court rejects Producers' third contention.

D. *Producers is liable for $375,000 for each year the takeout letter was in effect.*

Producers finally asserts that it should be liable only to the extent of $375,000, since Enterprises owned an economic interest in any production exceeding the amount. The Government argues that the takeout letter shifted the entire risk of loss to Producers, and that Producers should bear the tax liability on all production payments after the letter was written. The Court agrees with Producers to the extent that the entire tax liability was not transferred.

The tax liability of Producers should rest on the amount Producers was obligated to pay the bank, not on the amounts Enterprises was paying in discharge of its debt. The Court holds that Producers should bear the tax liability on that amount it was obligated to pay the bank at any time during the three years beginning January 2, 1963.

If, for example, the bank called on Producers to pay $100,000 at some time during 1963, and Producers performed, then Producers would only be liable for the tax on $275,000 after that date. If the bank made no further demand on Producers, then the company would continue to be liable for $275,000 during the rest of the time the takeout letter was in effect.

In this case the bank never called on Producers to pay any amount of the $375,000. This Court concludes that the risk of loss was shifted to Producers in the amount of $375,000 for each year the takeout letter was in effect. Therefore Producers is to be attributed with $375,000 income for each year in question. Any amount in excess of $375,000 is to be attributed to Enterprises for each year in question.

The Government is requested to submit an appropriate order to the Court.