The **PRODUCERS SUPPLY & TOOL COMPANY, Plaintiff-Appellant-Cross-Appellee,**

v.

The **UNITED STATES of America, Defendant-Appellee-Cross-Appellant.**

No. 71–3384
Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Aug. 15, 1972.

As Modified On Denial of Rehearing Oct. 12, 1972.

---

* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York, 5 Cir. 1970, 431 F.2d 409, Part I.

Fred A. Sanders, McDonald, Sanders, Ginsburg, Phillips, Maddox & Newkirk, Fort Worth, Tex., for appellant.

Scott P. Crampton, Asst. Atty. Gen., Ben A. Douglas, Meyer Rothwacks, Grant W. Wiprud, David English, Carmack, Attys., Tax Div., Dept. of Justice, Dallas, Tex., Eldon R. Mahon, U. S. Atty., Fort Worth, Tex., for appellee.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.

GOLDBERG, Circuit Judge:

Hopefully we return to our last encounter with the so-called ABC transaction, endemic to oil and gas taxation, but now buried in the statutory graveyard marked "repealed." 26 U.S.C.A. § 636. Because the transactional facts of this case were consummated before ABC's statutory rigor mortis set in, we must clinically exhume and examine the vital organs of the ABC corpus, to try to come to a diagnostic conclusion as to whether or not the alphabetical contrivance can meet our pre-1969 tests for validity. Finding that the transaction in the instant case could meet those tests, we reverse the judgment of the district court for verification.

In 1956 H. L. Perkins (hereafter "A") sold working interests in oil and gas properties to Northwest Oil Company (hereafter "B") for $300,000. Northwest is a wholly-owned subsidiary of the taxpayer, The Producers Supply & Tool Company, an Ohio corporation with its principal place of business in Texas. Taxpayer and Northwest filed a consolidated return for the tax years in question and are the same taxable entity (B) for purposes of this ABC transaction. A reserved production payments in the principal sum of $2,200,000, plus interest, to be paid from 80% of the production from the assigned interests. Simultaneously, A sold the reserved production payments to Fort Worth Enterprises (hereafter "C") for $2,200,000. C paid A $550,000 in cash and two notes totaling $1,650,000 for the production payments. C borrowed the cash from a bank in Dallas, Texas, and executed a note to the bank with a lien on the first

$550,000 of the production payment as security. A's two notes from C were secured by a lien on the last of the production payments. As C received income from the production payments, that income was applied to C's debt to the bank.

In 1957 C borrowed another $550,000 from the bank and paid that entire sum to A. At the same time, A assigned $550,000 of its lien on production payments to the bank as security for C's second loan. C borrowed an additional $500,000 in 1958, and again paid this amount to A. Once more, A assigned $500,000 of its lien to the bank as security for C's debt. At the same time that this second refinancing was transacted B and C agreed to reduce the percentage of production reserved to B from 80% to 65%, resulting in a longer payout period for C. As a condition both to this agreement between B and C and to the additional loan to C, the bank demanded and received a "take out" letter as security. That letter was written and signed by B's president and majority shareholder[1] and his son, who agreed that B would either find a third-party purchaser for the last $300,000 of C's debt to the bank or pay the last $300,000 of indebtedness itself. The bank could demand a third-party purchaser or payment at any time within three years. Similar loans and take out letters were exchanged in 1960, 1961, and 1963, each transaction following the pattern initiated in 1958. After the 1963 transaction taxpayer did secure a third-party guarantor for the notes.[2] At no time during the payout period was any guarantor required to make any payments under the terms of the "take out" letters, for C's indebtedness to the bank was satisfied entirely out of production payments.

Taxpayer and Northwest filed a consolidated return for the tax years of 1964 and 1965, but did not report any income that accrued to the production payments since they claimed no interest in the oil. The Commissioner assessed a deficiency for the two years, and taxpayer brought suit for a refund in the district court.[3] The district court, 338 F.Supp. 1401 held that B's "take out" letters operated to create an economic interest in the production payments in B to the extent of B's guaranty, and that C did not " . . . look *solely* to the extraction of oil or gas for a return of his capital" as is required in an ABC transaction. Commissioner of Internal Revenue v. Southwest Exploration Co., 1956, 350 U.S. 308, 314, 76 S.Ct. 395, 398, 100 L.Ed. 347, 354. Therefore, the district court concluded that the tax contrivance was scuttled by B's letters, rendering B taxable on the income that accrued to the production payments during the tax years in question to the extent of B's guaranty.[4]

The art of the ABC transaction is, of course, to gather tax benefits for A and

---

1. Taxpayer's president owned between 30% and 40% of Producers' outstanding stock. His family owned approximately 70% of the stock. The district court concluded that taxpayer's president and his son were acting as taxpayer's alter-ego and entirely in taxpayer's behalf, and that conclusion has not been seriously disputed in this appeal.

2. Since the third party was secured in 1963, the take out letters remained in effect in 1964 and 1965, the tax years in question in this appeal.

3. The failure of taxpayer to include production payments as taxable income in its 1964 and 1965 returns was first raised by the Government as a set-off to taxpayer's complaint. The issues raised in the complaint were settled, and only the set-off remained for adjudication below.

4. The Government asserts briefly that proof of B's economic interest in the oil should render B taxable on the entirety of the production payments, not just to the extent of B's guaranty. However, the Government does not appeal that limitation on B's taxability. Because the Government did not appeal the original determination and because this court holds that B is not necessarily taxable at all on the production payments, we find it unnecessary to resolve the issue of the extent to which B might, under different circumstances, be taxable on oil income in which B held a clear economic interest.

*B* at the expense of *C*. To come within the confines of the ABC artifice, *C*, the purported taxpayer of the transaction with regard to the production payments, must obtain an economic interest in the oil and ". . . must look *solely* to the extraction of oil or gas" for a return of capital. Commissioner of Internal Revenue v. Southwest Exploration Co. 350 U.S. at 314, 76 S.Ct. at 399, 100 L.Ed. at 354. Although a number of cases have construed the efficacy of various wrinkles in the ABC operation, two cases are of critical importance to this appeal, Holbrook v. Commissioner of Internal Revenue, 5 Cir. 1971, 450 F.2d 134, and Commissioner of Internal Revenue v. Estate of Donnell, 5 Cir. 1969, 417 F.2d 106.[5] The wrinkle in *Holbrook* and *Donnell* was a guaranty by *B* of the bank's loan to *C* together with *B*'s right of subrogation against *C*.

In Holbrook v. Commissioner of Internal Revenue, *supra*, A conveyed various undivided interests in oil, gas, and other mineral and leasehold interests to *B*, reserving a production payment of $34,857.43, plus 6½% interest per year on the unliquidated balance payable out of 80% of the minerals produced from the assigned interests. Simultaneously, *A* conveyed the reserved production payment to *C*. *C* then borrowed $34,512.31 from a bank, payable within a year in eleven installments at 6% interest and secured by a deed of trust covering the production payment. At the same time, *B* executed and delivered to the bank, in consideration for the bank's loan to *C*, a "take out" letter which provided that *B* would locate a purchaser for *C*'s note or would purchase the note itself on demand. *B*'s "take out" letter was to become effective within 12 months, and the purchase price was to equal the unpaid balance of the note plus all accrued interest. If it did call upon the take out

letter, the bank agreed to assign its security interest in the production payment to *B* or to the purchaser whom *B* had agreed to locate. As in the instant case, *B* was never called upon to fulfill the terms of the "take out" letter, and the letter was eventually retired. As is usual in these transactions, *B* did not have any propriety interest in *C*.

The facts of Commissioner of Internal Revenue v. Estate of Donnell, *supra*, are very similar to those of the instant case and to those of *Holbrook*. In *Donnell* A sold mineral interests to *B*, reserving certain production payments payable out of a certain percentage of the production. *A* then sold the reserved production payments to *C*, and *C* borrowed the full amount of its obligation to A from a bank. As security for the loan, *C* tendered a deed of trust conveying the production payments to a trustee for the bank. *B* simultaneously agreed with the bank that it would, at the bank's request, purchase the unpaid balance of *C*'s note or the unliquidated balance of the production payment. As in the instant case and in *Holbrook*, *B* never had to make good on its "take out" letter, for all production payments were paid in full from the lease proceeds before the note became due. As the *Holbrook* court read *Donnell*:

"The Court found that the purpose of the taxpayer's 'take-out' letter was expressed as an inducement to the Calm Corporation [C] to purchase the production payment from Fleming [A] and as an inducement to the bank to loan Calm Corporation [C] the funds with which to purchase the production payment. It was further found that *this guaranty insulated both the bank and Calm Corporation from any loss* which might occur if lease production was insufficient to liquidate the production payment. Thus neither the

5. For a historical development of the nuances of the ABC transaction, *see, e. g.,* Palmer v. Bender 1933, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489; Anderson v. Helvering, 1940, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277; Thomas v. Perkins, 1937, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324; Commissioner of Internal Revenue v. Southwest Exploration Co., *supra.* Each of these cases is analyzed in Holbrook and Donnell.

bank nor Calm [C] looked solely to the oil production for a return on their investments; each could look to taxpayer."

Holbrook v. Commissioner of Internal Revenue, 450 F.2d at 138. Arguably, *B's* guaranty would operate ipso facto to remove *C's* *sole* dependence on the extraction of the oil for *C's* return of capital, thus collapsing the ABC transaction and rendering *B* taxable to some degree, *see supra* note 5. But the panel in *Holbrook* did not read *Donnell* to hold that *any* additional security provided by *B* would operate to shift *C's* reliance on the production payments as its sole source of return. Instead, the majority in *Holbrook* held that *B's* right of subrogation against *C* constituted prima facie evidence that *B* retained no economic interest whatsoever in the oil and, therefore, was not taxable on the production payments. The *Holbrook* panel unanimously concluded that *B's* right of subrogation against *C* *could* insulate *B* from an interest in the production payments despite *B's* guaranty, thus leaving *C* as the taxable entity. The *Holbrook* court split only on the question of which party had the burden of proving that *B's* right of subrogation against *C* was economically "substantial." The majority concluded that

"... [t]he burden of proving that such transactions [the standard ABC transaction together with B's guaranty of C's loan and B's right of subrogation against C] are in reality a sham or lacking in substance is on the Commissioner, not the taxpayer. *The taxpayer must only prove that the subrogation right exists* in order to claim a lack of economic interest in the oil in place. . . ."

Holbrook v. Commissioner of Internal Revenue, 450 F.2d at 142 [emphasis added]. Judge Tuttle dissented *forcefully,* arguing that

"... the taxpayer [should be] required to prove not only that he would have enjoyed a legal right of subrogation to the claims of the bank

over and against . . . [C], but that such right had value as well, in short, that . . . [C] had some economic substance."

Holbrook v. Commissioner of Internal Revenue, 450 F.2d at 143. Despite Judge Tuttle's vigorous dissent, the majority's view of ABC transactions and of *Donnell* was not disapproved when this court denied en banc consideration in Holbrook v. Commissioner of Internal Revenue, 5 Cir. 1971, 451 F.2d 1350.

If we had this corpus on the operating table for the first time, we might make the incisions regarding economic interest in a different place and manner. But the incisions have already been made and the stitches removed by *Holbrook* and the denial of en banc consideration. However, we must note that we do not discern any substantive difference among the transactions in *Holbrook,* in *Donnell,* and in the instant case. In each transaction the guaranty from *B* to the bank essentially ". . . insulated both the bank and [*C*] from any loss which might occur if lease production was insufficient to liquidate the production payment", which the majority in *Holbrook* found to be true only of *Donnell.* It seems clear that *any* guaranty from a third party, in these transactions the *B*-party of the ABC arrangement, would operate to insulate the lender and the borrower from any loss. After all, that is the function of a guaranty. We agree with the panel in *Holbrook* that this insulation should lead to the conclusion that ". . . neither the bank nor [*C*] looked *solely* to the oil production for a return on their investments; each could look to taxpayer [*B*]." Holbrook v. Commissioner of Internal Revenue, 450 F.2d at 138. Nevertheless, we are bound by *Holbrook's* analysis. Indeed, the facts of the instant case are stronger than the facts of *Holbrook* to support the propositions of the respective *B's* in these transactions. In *Holbrook,* *B's* "take out" letter was issued simultaneously with the deed of trust from *C* to the bank. In the instant case the "take out"

letters did not appear until about one year after the initial ABC transaction and then only to refinance a part of the original loan. Thus, the entirety of the transaction in *Holbrook* smacks much more of tax gimmickry than does the entirety of the transaction here. Because the existence of a subrogation right against *C* establishes *B*'s prima facie case that *B* is not economically interested in the oil production and, therefore, not taxable on its production payments, the burden of proof is on the Government to establish that *B*'s right of subrogation against *C* is without "economic substance." We conclude that the Government has failed to discharge its burden. The court below did not find that the subrogation agreement was a sham, and its factual finding that *C* had a paper net worth (paid-in capital plus earned surplus) of no more than $28,000 in any taxable year does not measure up to a demonstration that such net worth figures reflected realistic or actual economic substance, rather than mere paper weight. The Government contends that the difference between a book value of $28,000 and a total debt of over $1,000,000 should operate as a matter of law to infer that *B*'s right of subroga-

tion against *C* was without economic substance. We cannot draw such an inference, for it is beyond question that book value simply does not reflect the true value of any business concern. *See, e. g.,* A. Robichek & S. Myers, Optimal Financing Decisions 130–131 (1965); E. Solomon, Theory of Financial Management 39–45(1963).[6]

█  The very able district judge conscientiously applied the law as he interpreted it prior to this court's decision in Holbrook v. Commissioner of Internal Revenue, *supra*. Because *Holbrook* was reported after the district court proceedings in the instant case, we conclude that the Government should be given the opportunity to carry its burden of proof to establish that *B*'s right of subrogation against *C* lacks economic substance. *Holbrook* relies extensively on Landreth v. Commissioner, 50 T.C. 803 (1968), for its reasoning regarding the allocation of taxable interests between *B* and *C*, a reasoning with which we have expressed some disagreement. In *Landreth*, however, a remand for findings of fact regarding economic substance was unnecessary because it was clearly established that *C* had a net worth of over $300,000 and was a "financially responsible par-

6. We feel compelled to note at this point that there are obvious inherent difficulties in the "economic substance" test of *Holbrook* in the context of these ABC-*cum*-guaranty-*cum* subrogation transactions. It is the economic premise of the ABC transaction that all parties will be forced in some manner to look basically only to C's production payments for their respective returns, whatever, the method of financing. In *Holbrook, Donnell,* and the instant case, for example, the writers of the "take out" letters were never compelled to make good on their guaranties to the banks. At the same time, it is a rare ABC transaction that will contain a C with substantial actual net worth. The *C* in Landreth v. Commissioner, 50 T.C. 803 (1968), was something of an exception, *for that C had a net worth of more than $300,000 to cover a debt of $60,000.*

The majority in *Holbrook* concluded that a

"  .  .  . right of subrogation, if given without any real substance and with

an intent only to inherit tax benefits resulting, would  .  .  . be given no effect by this Court."

Holbrook v. Commissioner of Internal Revenue, 450 F.2d at 142. But the majority does not consider the degree of proof that might be deemed sufficient for the Government to establish C's lack of "economic substance" for purposes of subrogation. If the Government's theory is correct, for example, the ABC transactions would be humpty-dumptied beyond recall unless the net worth of C were at all times at least equal to the outstanding debt. That, in the standard ABC transaction, would be very unusual. At the same time, however, we note that "economic substance" in other contexts is not wholly beyond the realm of possible judicial determination on a case by case basis. *See, e. g.,* Knetsch v. United States, 1960, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128; Salley v. Commissioner of Internal Revenue, 5 Cir., 1972, 465 F.2d 479 [loan transactions used to pay premiums on insurance policies].

ty." Landreth v. Commissioner, 50 T.C. at 809. In *Holbrook* the court apparently received from the parties no estimates whatsoever of net worth, for allocation of the burden of proof was the sole issue discussed. In the instant case the district court found that *C* was a "dummy" corporation, but the court simply made its findings on economically insufficient evidence. Because the findings of fact below are incomplete with regard to the economic substance of *B*'s right of subrogation against *C*, the Government should be given the opportunity to establish its case as a matter of fact.

Judicial candor compels us to state that the *Holbrook* panel's interpretation of ABC transactions and of Commissioner of Internal Revenue v. Estate of Donnell, *supra*, is, at least arguably, wrong. But we must, like the light brigade, charge half-a-length on and apply *Holbrook*. Despite canons to the left of it and canons to the right of it, this case must be reversed and remanded.

Reversed and remanded.