ESTATE OF BEN STONE, DECEASED, RUTH B. STONE, ADMINISTRATRIX, AND RUTH B. STONE, SURVIVING WIFE, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3395–66, 3399–66, 3400–66, 3401–66. Filed April 17, 1968.

*Miles Jaffe* and *Howard K. Schwartz*, for the petitioners.
*John H. Menzel*, for the respondent.

FAY, *Judge:* The statutory notices issued in these cases involve deficiencies in income taxes in docket No. 3395–66 and duplicate trans-

[1] Proceedings of the following petitioners are consolidated herewith: Estate of Ben Stone, Deceased, Ruth B. Stone, Administratrix, docket No. 3399–66; Estate of Ben Stone, Deceased, Ruth B. Stone, Administratrix, W.W.A., docket No. 3400–66; and Ruth B. Stone, Transferee of the assets of Sango Co., docket No. 3401–66.

feree notices of liability in docket Nos. 3399–66 and 3401–66. The Court granted respondent's motion to file amended answers in docket Nos. 3395–66, 3399–66, and 3401–66.

The liabilities and deficiencies in income taxes for the various years in the respective dockets as per the statutory notices and also respondent's amended answers are as follows:

| Docket No. | Years involved | Deficiency or liability per statutory notice | Deficiency or liability per amended answer |
|---|---|---|---|
| 3395–66 | 1959 | $19, 731. 42 | $19, 731. 42 |
| | 1960 | 2, 592. 01 | 2, 592. 01 |
| | 1961 | 225, 985. 92 | 63, 812. 75 |
| | 1962 | 36, 562. 76 | 119, 316. 97 |
| 3399–66 | 5/31/57 | 37, 742. 72 | 37, 742. 72 |
| | 5/31/58 | 92, 141. 71 | 77, 587. 01 |
| | 5/31/60 | 7, 172. 57 | 13, 942. 50 |
| 3401–66 | 5/31/57 | 37, 742. 72 | 37, 742. 72 |
| | 5/31/58 | 92, 141. 71 | 77, 587. 01 |
| | 5/31/60 | 7, 172. 57 | 13, 942. 50 |

The statutory notice in docket No. 3400–66 involves a deficiency in estate tax in the amount of $65,520.13.

Various adjustments raised in each of the above statutory notices have been conceded and/or settled by the parties and the remaining issues for determination are as follows:

(1) Whether additional income was constructively received by Ben Stone and Ruth B. Stone and by their transferor, Sango Co., from an oil production payment payable to another in connection with the Port Acres property. If such income is taxable to petitioners, there is a further issue as to the allowable depletion deduction.

(2) What is the fair market value of the Port Acres property as of May 31, 1961, the date of the liquidation of Sango Co., and as of September 12, 1962, the date of Ben Stone's death.

(3) Whether petitioners in docket Nos. 3399–66 and 3401–66 are each liable as a transferee of the assets of Sango Co. for deficiencies which are due from Sango Co. for the fiscal years ended May 31, 1957, May 31, 1958, and May 31, 1960.

FINDINGS OF FACT

Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Ruth B. Stone (hereinafter referred to as Ruth) is the widow and administratrix w.w.a. of the estate of Ben Stone (hereinafter referred to as the estate). Ben Stone (hereinafter referred to as Ben) died a resident of the State of Michigan on September 12, 1962. Ruth is the petitioner in each of these cases either in her individual capacity (docket No. 3401–66), as administratrix w.w.a. of the estate (docket

Nos. 3399–66 and 3400–66), or in both capacities (docket No. 3395–66). Ruth had at the time of filing of each of the petitions an office address at Detroit, Mich. Docket Nos. 3399–66 and 3401–66 involve the respective petitioners' liabilities as transferees of assets of Sango Co. (hereinafter referred to as Sango) and represent duplicate liabilities. The income tax returns of Ben and Ruth (and the estate after Ben's death), the estate tax returns for the estate, and the income tax returns of Sango for the years involved were all filed with the district director of internal revenue, Detroit, Mich.

Sango, formerly Bonan Co., was incorporated on June 8, 1955, and was engaged in the manufacture of automobile parts until sometime prior to October 15, 1958, when it sold all of its fixed assets, except some transportation equipment and furniture and fixtures. On its Federal income tax returns, Sango reported taxable income or loss as follows:

| Fiscal year ended— | Taxable income (or loss) | Fiscal year ended— | Taxable income (or loss) |
|---|---|---|---|
| 5/31/56 | $149,731.72 | 5/31/59 | ($130,812.19) |
| 5/31/57 | 574,390.66 | 5/31/60 | (68,332.15) |
| 5/31/58 | 516,824.92 | 5/31/61 | (240,218.59) |

On August 26, 1960, an "Application for Tentative Carryback Adjustment," Form 1139, was filed by Sango stating that an operating loss was incurred in the fiscal year ended May 31, 1960, in the amount of $72,582.15 and requesting that it be carried back to the fiscal year ended May 31, 1957, resulting in a decrease of the income taxes paid in that year in the amount of $37,742.71. On September 14, 1960, a tentative allowance in the amount claimed was approved by the district director and that amount was subsequently paid to Sango. On June 26, 1961, an "Application for Tentative Carryback Adjustment," Form 1139, was filed by Sango stating that an operating loss was incurred in the fiscal year ended May 31, 1961, in the amount of $241,281.09 and requesting that it be carried back to the fiscal year ended May 31, 1958, to decrease the income tax paid in the amount of $125,466.16. The district director of internal revenue, Detroit, Mich., tentatively approved the claimed allowance which was paid on August 30, 1961.

Prior to June 11, 1959, the common stock of Sango was owned equally by Ben, Ruth, William C. Newberg, and Dorothy Newberg. Pursuant to a contract of sale dated June 11, 1959, the Newbergs sold all of their common stock plus their preferred stock to Ben. In exchange for the preferred stock, they were to receive $10,000 cash. In exchange for the common stock, they were to receive an amount equal to 50 percent of the excess of the fair market value of all of Sango's assets over the sum of its liabilities and $10,000 determined as of the first of the following two dates, May 31, 1961, or the

date of final distribution in complete liquidation of the corporation. All assets were to be valued at net book value except oil and gas properties which were to be valued at their appraisal value. Payment to the Newbergs was to be made within 30 days of the relevant valuation date.

As a result of this purchase, Ben became the owner of 75 percent of the common shares and Ruth owned the remaining 25 percent. Ben also owned 100 percent of the preferred shares of Sango.

On June 3, 1960, Sango adopted a plan of complete liquidation at a meeting of its board of directors. Such action was approved that same day by Ben and Ruth, the shareholders of Sango.

On June 7, 1960, Sango made a partial liquidating distribution in the total amount of $219,090.57. The Newbergs received the $109,545.29 as a payment of Ben's obligation pursuant to the June 11, 1959, contract of sale of their stock of Sango to Ben. The Stones received the remainder.

On July 25, 1960, the Newbergs assigned all of their right, title, and interest under the above agreement to Chrysler Corp. (hereinafter referred to as Chrysler). In August 1960 Chrysler filed suit in the Circuit Court for the County of Wayne, State of Michigan, against Ben, Ruth, and Sango. The bill of complaint alleged, *inter alia*, that prior fraudulent conduct on the part of Ben and William C. Newberg, the latter also being an employee of Chrysler, had resulted in substantial profits to Sango at the expense of Chrysler. The complaint further alleged that all of Sango's assets were acquired with the profits of this fraudulent conduct and that, therefore, such assets were held by Sango in constructive trust for the benefit of Chrysler.

On May 26, 1961, a meeting of the board of directors of Sango was held in which steps were taken to effect a complete liquidation of Sango. On May 31, 1961, the complete liquidation of Sango was accomplished and Ruth and Ben received all of Sango's assets in a final distribution in the ratio of their stockownership—one-fourth and three-fourths, respectively. The assets distributed included all of Sango's interest in certain Port Acres property, together with other assets which had a fair market value in the amount of $142,358.56. Sango had liabilities as of that date of not less than the following: (1) $275,000 representing the then contingent liability to Chrysler; (2) trade accounts payable of $47,724.12; and (3) legal fees payable of $42,149.62.

On September 12, 1962, Ben died.

On December 20, 1962, an agreement was executed between Chrysler and Ruth in her various capacities which provided, *inter alia*, for the dismissal of the suit by Chrysler referred to above in consideration of the payment of $275,000 by Ben's estate. Also on December 20, 1962,

an agreement was executed between Chrysler and Ruth, as administratrix of Ben's estate. Under the terms of this agreement, Chrysler received $125,000 as the balance of the purchase price for the stock of Sango, pursuant to the June 11, 1959, contract of sale between Ben and the Newbergs which later the Newbergs had assigned to Chrysler.

Effective October 1, 1958, Sango entered into a transaction whereby it purchased fractional working interests in oil and gas leases covering lands in Jefferson County, Tex., in the Port Acres field. The acquisition of the Port Acres property by Sango on October 1, 1958, was the culmination of several months' efforts. Ben, president of Sango, was the first person to become aware of the possibility of buying the property. Over a period of several months prior to October 1, 1958, Charles C. Stewart, Jr., assistant vice president in charge of the Petroleum Department, National Bank of Detroit (hereinafter referred to as the bank), made an investigation of the property to ascertain the amount of money that the bank would loan on the property. Once assured of bank financing, documents were executed by the various parties to be effective October 1, 1958. Pursuant to an agreement entitled "Contract of Sale," Michel T. Halbouty (hereinafter referred to as Halbouty) sold to William J. Scripps Associates, Inc. (hereinafter referred to as Scripps), undivided interests in certain oil, gas, and mineral leases, together with undivided interests in the equipment and personal property located or used in connection with such leases. The contract of sale provided for a purchase price of $2,750,000, with $2,510,000 representing the agreed purchase price of the oil, gas, and other minerals and $240,000 representing the agreed purchase price of the equipment and personal property located, used, or obtained in connection with such leases.

In connection with this transaction, the bank requested a statement from Scripps showing its net worth. In response to that request, a balance sheet was submitted which showed that Scripps had capital stock of only $1,000 and that it had a deficit as of August 31, 1958, of $32,486.55. Also submitted was a statement of income and expenses covering the period from January 1, 1955, to August 31, 1958. This statement showed that Scripps had no income after January 1, 1957, with a net loss of $14,256.03 in 1957 and $6,776.14 for the first 8 months of 1958.

A document entitled "Deed of Trust and Assignment of Production" was executed between Scripps and the bank. This conveyance was to secure a demand promissory note in the amount of $2,500,000, plus interest at 5½ percent per annum executed by Scripps payable to the order of the bank. Pertinent parts of this deed of trust are as follows:

### WITNESSETH:

In order to secure the payment, both principal and interest, of the indebtedness as herein defined, and in consideration of the uses and trusts herein set forth * * *, Mortgagor has GRANTED, SOLD, CONVEYED, TRANSFERRED and ASSIGNED, and by these presents does hereby GRANT, SELL, CONVEY, TRANSFER and ASSIGN unto the Trustee and to his successors in the trust, and to his or their successors and assigns, forever, the land and undivided oil, gas and mineral interests located in Jefferson County, Texas, * * *. Together with all of Mortgagor's interest in the personal property, oil, gas, oil wells, boilers, engines, pipes, connections, casing and equipment of every kind and character upon, connected with or appurtenant to the property * *.* now or hereafter situated thereon, or which may hereafter be placed thereon * * *

\*  \*  \*  \*  \*  \*  \*

### SECURED INDEBTEDNESS

This conveyance is in trust, however, to secure the indebtedness of Mortgagor to Mortgagee, as follows:

(a) That certain promissory note of even date herewith, executed by Mortgagor, payable, on demand, to the order of Mortgagee, in the principal sum of Two Million Five Hundred Thousand Dollars ($2,500,000.00), bearing interest at the rate of five and one-half per cent (5½%) per annum from date until maturity, interest payable monthly as it accrues, the first payment of interest being due and payable on the 25th day of November, 1958, and a like payment of interest being due and payable on the 25th day of each and every succeeding calendar month thereafter.

(b) Any extension or renewal of said note or notes, for any portion of the indebtedness evidenced by said note described in subparagraph (a), including any additional money owing to Mortgagee under the provisions of subparagraph (c), but excluding any other or new indebtedness of Mortgagor.

(c) Any money which may hereafter be advanced by Mortgagee or become owing to Mortgagee hereunder on account of the failure of Mortgagor to comply with any one or more of the covenants of this deed of trust.

The term "indebtedness" as used herein shall mean and include said note or notes and all other indebtedness mentioned in subparagraphs (a), (b) and (c) above.

\*  \*  \*  \*  \*  \*  \*

### POWER OF SALE

But in case of any one or more of the following events of default shall happen, that is to say, should:

\*  \*  \*  \*  \*  \*  \*

[Listing of events by default]
then and in each and every such case the whole amount of said indebtedness remaining unpaid shall be due and payable without notice or demand, and thereupon, or at any time thereafter while said indebtedness or any part thereof remains unpaid, it shall be the duty of the Trustee and of his successors in the trust, on the request of any holder or holders of said indebtedness or any part therof to enforce this trust; and after advertising the time, place and terms of the sale for at least three (3) consecutive weeks prior to the date of sale, by posting or causing to be posted written notices at three (3) public places in Jefferson County, Texas, wherein the real property hereby mortgaged is situated, one of which shall be at the Courthouse door of Jefferson County, Texas, to

sell the property hereby mortgaged, either as an entirety or in parcels, as the Trustee may elect, at public vendue at the Courthouse door of Jefferson County, Texas, wherein the real property hereby mortgaged is situated (without the necessity of having any of the personal property hereby mortgaged present at such sale), on the first Tuesday of any month between the hours of ten o'clock (10:00) A.M. and four o'clock (4:00) P.M. to the highest bidder for cash, and make due conveyance to the purchaser, or purchasers, with covenants of general warranty binding the Mortgagor, its successors and assigns.

No single sale or series of sales by the Trustee or any substitute Trustee hereunder shall exhaust the power of sale hereunder, but such power shall exist for so long as all or any part of said indebtedness remains unpaid and may be exercised in the manner hereinabove provided as often as the circumstances require to give Mortgagee full relief hereunder.

Mortgagee shall have the right to bid and become the purchaser at any sale made hereunder.

The Trustee shall pay, distribute and apply the proceeds of any such sale as follows: First, in payment of all the expenses of advertising, sale and conveyance; Second, in payment to Mortgagee of the principal and interest accrued on advances made for the account of Mortgagor hereunder, for the protection, preservation or operation of the mortgaged property, application to be made first to interest and then to principal; Third, in payment of the principal and interest due and unpaid on the indebtedness secured hereby, application to be made by Trustee in such manner as Mortgagee may elect; Fourth, pay the balance, if any, of the proceeds of any such sale over to Mortgagor, its successors or assigns, and said sale shall forever be a bar against said Mortgagor, its successors and assigns, and all other persons claiming under any of them. * * *

\* \* \* \* \* \* \*

### ASSIGNMENT OF PRODUCTION

As additional security for the payment of all indebtedness secured hereby, and in addition to the conveyance to the Trustee herein made, Mortgagor does hereby TRANSFER, ASSIGN and CONVEY unto Mortgagee, its successors and assigns, all of the oil, gas and other minerals produced, saved and sold from the mortgaged property and attributable to the interest of Mortgagor therein subsequent to 12:01 A.M., October 1, 1958, together with the proceeds of any sale thereof, and all sums of money accruing to the interest of Mortgagor by reason of production from said properties; * * *

By agreement dated October 1, 1958, Scripps and Halbouty agreed to operate the property and Scripps agreed to bear equally with Halbouty the cost of all operations.

Also, effective as of October 1, 1958, an agreement titled "Conveyance of Leasehold Interests" was entered into between Scripps and Sango. By this agreement, Scripps transferred to Sango all of the interest it acquired from Halbouty in the oil, gas, and mineral leases and the equipment or property used in the Port Acres property. Pertinent provisions of that agreement are set out below:

### II.

There is also excepted from this conveyance and reserved to the Grantor a production payment payable to Grantor solely out of the oil, gas and other

minerals, if, as and when produced, saved and sold from the oil, gas and minerals conveyed hereby, and more particularly described as follows:

Ninety per cent (90%) of the oil, gas and other minerals in and under and if, as and when produced, saved and sold from the undivided oil, gas and mineral interests conveyed hereby, until, solely out of the proceeds derived from the sale of such undivided oil, gas and other mineral production accruing to the interest conveyed hereby, Grantor, its successors and assigns, shall have received, without deduction and free of all costs of drilling and production, in the aggregate the following amounts:

1. The Sum of Two Million Five Hundred Thousand Dollars ($2,500,000.00) hereinafter called "primary amount".

2. An amount of money, hereinafter called "secondary amount", equal to five and three-fourths percent (5¾%) per annum from October 1, 1958 on the unpaid balance of the primary amount from time to time outstanding until the primary amount is paid in full. The secondary amount shall be computed monthly beginning November 25, 1958 and on the 25th day of each month thereafter, on the basis of actual days elapsed, but assuming a 360 day year.

3. An additional sum equivalent to the amount of ad valorem, production, severance or similar taxes, * * *

After the amounts above provided for have been received by Grantor, such production payment shall terminate and such interest shall ipso facto vest in Grantee, its successors and assigns, without the necessity of any conveyance by Grantor. * * *

### III.

It is, however, expressly agreed and understood that Grantee shall have no personal liability nor any other liability for such production payment, and such production payment is payable solely and only from the oil, gas and other minerals if, as and when produced.

### IV.

This conveyance is also made subject to a first and prior lien in favor of the National Bank of Detroit, but it is, however, expressly agreed that Grantee, its heirs and assigns, shall have no personal liability nor any other liability for the payment of any debt or other obligation secured by such lien.

Sango and later the Stones agreed to be obligated under the terms of the operating agreement between Scripps and Halbouty.

From October 1, 1958, to not later than October 1966, the gross income from the production of oil and gas from the Port Acres property was distributed by check, by the operator, Halbouty. These checks were sent by Halbouty to the bank. Pursuant to its agreement with Scripps, the bank applied the amount attributable to Scripps' production payment to interest on its loan, to reduce the principal of the loan and any remainder to Scripps' account. Under instructions from Sango, the bank deposited the amount attributable to its interest directly to its account and later to that of the Stones. This latter amount was in no way restricted as to its use and was the property of Sango and later the Stones.

It was understood, however, between the bank and Sango that in the event of Scripps' default the bank could foreclose under the "Deed of Trust and Assignment of Production" and thereafter the bank would

be entitled to apply the income attributable to Sango's interest to reduction of the debt.

On October 10, 1966, a document entitled "Discharge of Deed of Trust and Reassignment of Production" was executed by the bank certifying that the "Deed of Trust and Assignment of Production" is fully paid, satisfied, and discharged. Scripps subsequently executed an agreement entitled "Termination of Production Payment" acknowledging that the production payment reserved to it in the "Conveyance of Leasehold Interests" to Sango is terminated.

An appraisal was made of the value of Sango's interest in the Port Acres property as of May 31, 1961, the date of Sango's liquidation, by Robert W. Harrison & Co. (hereinafter referred to as Harrison), a firm of well qualified and experienced consulting petroleum engineers and geologists. As of that time, the Port Acres property was determined by Harrison to have a fair market value of $400,000, after retirement of the outstanding balance of the loan at the bank. On the Federal income tax returns filed by Ben and Ruth for the taxable year 1961, the Port Acres property was reported as having a fair market value of $400,000, after loan retirement.

In arriving at a fair market value of $400,000 as of May 31, 1961, Harrison determined the estimated total future gross income from the Port Acres property to be $3,519,640. After deducting all estimated expenses to produce the income, including retirement of the loan outstanding at the bank, the future net income was determined to be $1,529,830. The present worth of this future net income was then determined to be $1,053,180 based on a discount rate of 6 percent per annum compounded semimonthly. This figure was then discounted by a risk factor of approximately 60 percent.

Harrison was also requested to make an appraisal of the Port Acres property as of September 12, 1962. That appraisal determined the fair market value of the Port Acres property to be $343,800. The 75-percent interest owned by Ben's estate was included in the estate tax return at a value of $257,850. The same method of determining the present worth of the future net income was used in the appraisal of September 12, 1962, as was used in the appraisal of May 31, 1961.[2] These values as of May 31, 1961, and September 12, 1962, represent Harrison's expert opinion as of the date the appraisal was made.

OPINION

The first issue for determination is whether Ben and Ruth and their transferor Sango constructively received additional income from an oil payment payable to another in connection with the Port Acres property.

---

[2] The risk factor as of Sept. 12, 1962, was approximately 44 percent.

This issue was first raised by the respondent by an amendment to his answer in this proceeding. Consequently, he must bear the burden of proof. Rule 32, Tax Court Rules of Practice.

The facts pertinent to this issue are not in dispute. The parties are agreed that effective October 1, 1958, the following events took place: (1) Halbouty transferred undivided interests in certain oil and gas leases to Scripps for $2,750,000, $240,000 of which was allocated to certain equipment and personal property. (2) In order to finance this acquisition, Scripps obtained a $2,500,000 loan with interest at 5½ percent from the bank giving in exchange its demand note. In order to secure payment of the note, Scripps assigned to the bank a deed of trust and an assignment of production from the property. (3) Scripps then conveyed the working interest in the property and the equipment and personal property to Sango for $250,000, subject to the bank's security interest, while reserving to itself a production payment in the amount of $2,500,000 plus an amount equal to interest at 5¾ percent payable solely out of 90 percent of the oil and gas as and when produced. Sango did not assume and was in no way liable either for the amount owing to the bank from Scripps or for the amount of the production payment reserved by Scripps.

The Supreme Court in *Thomas* v. *Perkins*, 301 U.S. 655 (1937), held that upon the assignment of an interest in an oil lease, if the assignor reserved a production payment, payable solely out of the oil produced, he would be considered to have retained a depletable economic interest in a sufficient amount of the oil produced to make the payment. The proceeds of the oil received by the assignor attributable to the production payment were therefore not includable in the gross income of the assignee.

Petitioners take the position that Scripps acquired the total interest from Halbouty and it then transferred the working interest to Sango reserving to itself a production payment payable solely out of oil produced. They conclude that under the *Thomas* v. *Perkins* decision Scripps retained a depletable economic interest and that the income from the production payment is therefore taxable to Scripps and not to Sango. They further point out that under the authority of our opinion in *J. Gregory Driscoll*, 3 T.C. 494 (1944), acq. 1944 C.B. 8, the fact that the entire property had been subjected by Scripps to what was in fact a mortgage to a bank, does not preclude Scripps from having an economic interest.

In *Driscoll*, the lessee under an oil lease mortgaged a one-sixteenth interest in the lease and assigned the production therefrom as security for a note. The lessee thereupon assigned this same one-sixteenth interest subject to the mortgage. This interest was ultimately acquired by the petitioner who took it subject to the mortgage. The respondent attempted to tax the petitioner on payments made to the bank in

retirement of the debt. This Court, in holding for the petitioner, stated:

It is the petitioner's contention that, since she did not, according to the express terms of her assignment, assume or agree to pay the indebtedness, but took the property subject to the encumbrance of the mortgage and the assignment of the oil, she is not taxable on the payments made on the indebtedness, which was at all times the legal obligation of some other person.

We think the petitioner's position is impregnable. In acquiring the interest in the lease, subject to the mortgage and the assignment, she acquired no interest whatever in the oil which produced the income here in dispute. That oil had been validly assigned before she acquired her interest in the lease. The oil to which she was entitled under her assignment was the oil to be produced after the obligation to the bank was fully satisfied. Until that time, she was not entitled to any oil produced from the premises in question, or to its proceeds. She never received the income, nor any benefit from it. It was not at her disposal or subject to her dominion or control. She could not successfully have demanded its payment to her. The indebtedness upon which it was applied was not incurred by her, nor was it ever assumed by her as a personal liability. * * * [3 T.C. at 496, 497]

The *Driscoll* case was followed by this Court in *Victor Rakowsky*, 17 T.C. 876 (1951), in holding for the Commissioner that payments from a certain property which were applied to a debt of the assignor are taxable to him and not to his assignee where the assignee took the property subject to, and did not assume, the debt. As in both the above cases, neither Sango nor the Stones assumed any liability for the debt owing from Scripps to the bank.

Respondent takes the position that the entire economic interest was acquired by Sango and not by Scripps. He contends that Scripps was only a convenience to the transaction and that he acquired and parted with the property in the same transaction. Though it is by no means clear from his briefs, respondent appears to recast the transaction. He seems to conclude that the production payment ran from Sango to the bank and that the existence of the deed of trust gave rise to an additional security which under the rule of *Anderson* v. *Helvering*, 310 U.S. 404 (1940), prevented the production payment from being a depletable economic interest. He therefore concludes that the payments to the bank attributable to the production payment merely went to reduce the mortgage held by the bank and that the reduction of this mortgage, which he states was a liability of Sango, constitutes income constructively received by Sango, and later the Stones.

As stated earlier, the burden of proof is upon the respondent. Though, with respondent, we are prone to view with some skepticism a transaction of this nature, we do not think that this alone is sufficient to satisfy his burden of proof. As far as we are able to ascertain from this record, Scripps is in no way related to Sango or the Stones and is not financially interested in the former. Neither does the record indicate that Scripps acted as an agent for either Halbouty or Sango.

We agree with respondent that the overall result of the transactions effective October 1, 1958, was to enable Sango ultimately to acquire the entire interest in the properties for a relatively small present investment, the balance being "financed" by way of the oil production. From what sources we have been able to find, however, this same statement can be made about every transaction in which an oil payment is utilized, including the transfer described in *Thomas* v. *Perkins, supra.* In fact, it is a recognition of this reality that has caused this Court to be reluctant to extend the benefit of this type of transaction to other areas of the law. See *Larry Hibler,* 46 T.C. 663 (1966), affirmed per curiam 383 F. 2d 989 (C.A. 5, 1967), and *Olin Bryant,* 46 T.C. 848 (1966), on appeal (C.A. 5, Apr. 5, 1967).

If, in fact, we can ignore the presence of Scripps in this series of events we might well be disposed to the result urged by the respondent. On the record before us, however, respondent has not adduced sufficient evidence on which to base his contention. Though he called as a witness the bank officer who arranged the loan to Scripps and asked him why the loan was made to Scripps rather than Sango, he did not pursue the answer given, i.e., that Scripps was the purchaser of the property, not Sango, and that this was a standard method of financing.

In the final analysis, respondent's position on this issue on the general ground that it is merely a financing method is far too general in light of the prior development in the field of oil and gas taxation. His position on the effective exclusion of Scripps from the transaction for tax purposes fails for lack of proof. We therefore hold for petitioners on this issue.

The second issue is to determine the fair market value of the Port Acres property. Respondent submits that as of May 31, 1961, the date of the liquidation of Sango, the property had a value of $400,000 and that as of September 12, 1962, the date of Ben's death, the value was $343,800.

The only contention raised by petitioners to support a lower valuation is predicated on the taxability of the proceeds for the production payment to Sango and/or petitioners. Because we have held that the income was not taxable to petitioners, we hold that respondent's valuations must be sustained.

The final issue for decision is the liability, if any, of Ben and Ruth as transferees of Sango. Again, petitioners have contested this issue only on the condition that the proceeds of the production payment were taxable to Sango and/or petitioners. As we have held this not to be the case, we construe the petitioners' brief as stating that there is no further contest as to this issue. We therefore uphold respondent's determination subject to the modifications required by our opinion herein.

*Decisions will be entered under Rule 50.*