Finley W. **HOLBROOK** and Faith Holbrook, Petitioners-Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent-Appellee.

No. 31113.

United States Court of Appeals, Fifth Circuit.

Oct. 8, 1971.

Rehearing and Rehearing En Banc Denied Dec. 20, 1971.

See 451 F.2d 1350.

Tuttle, Circuit Judge, dissented and filed opinion.

from that fact coupled with proof of an understatement of income." Holland v. United States, *supra* at 128, 75 S.Ct. at 132.

Wm. Monroe Kerr, Midland, Tex., for petitioners-appellants; Kerr, Fitz-Gerald & Kerr, Midland, Tex., of counsel.

Johnnie M. Walters, Asst. Atty. Gen., Tax Div., Dept. of Justice, K. Martin Worthy, Chief Counsel, Bobby D. Burns, Atty., Int. Revenue Serv., Meyer Rothwacks, Grant W. Wiprud, David English Carmack, Attys., Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before TUTTLE, THORNBERRY and INGRAHAM, Circuit Judges.

THORNBERRY, Circuit Judge:

This appeal involves alleged deficiencies in taxpayer's income taxes for the years 1963 and 1964 in the amounts of $3,263.45 and $4,314.79, respectively. Judgment for respondent (the Commissioner) was reported on August 25, 1970 at 54 T.C. 1617. Jurisdiction is conferred on this Court by Section 7482 of the Internal Revenue Code of 1954.

The facts are not in dispute. In December, 1962, Ecland Oil Participation Corporation (Ecland) conveyed various undivided interests in oil, gas, and other minerals and leasehold interests to Holbrook (taxpayer), reserving a production payment in the principal sum of $34,857.43, plus interest at the rate of 6½ per cent per annum on the unliquidated balance, payable out of 80 per cent of the minerals produced from the interests assigned. At the same time, Ecland reconveyed the reserved production payment to G & W Oil Corporation (G & W).

G & W then executed and delivered to C. J. Kelly, trustee for the First National Bank of Midland, Texas (First National), a deed of trust covering the production payment to secure a negotiable note in the principal amount of $34,512.31 with interest at 6 per cent per annum and payable on or before December 15, 1963, in eleven monthly installments. Taxpayer simultaneously executed and delivered to First National a "take-out" letter, which provided that, in consideration of First National's loan to G & W, taxpayer on demand would, locate a purchaser or would himself purchase G & W's note to First National. This provision became effective twelve months after the date of the "take-out" letter and specified that the purchase price would equal the unpaid balance of the note plus all accrued but unpaid in-

terest. The letter further provided that upon such contingency First National would assign its security interest in the production payment to the purchaser.

The production payment reserved by Ecland was paid in full prior to October 31, 1964. All payments made in satisfaction of the production payment were paid to First National for credit to the account of G & W. On an undetermined date, between the execution of the "take-out" letter and the payment of the note, First National redelivered the "take-out" letter to taxpayer and thereafter regarded it as of no force and effect. At no time did taxpayer have any proprietary interest in G & W.

We thus have in effect an ABC transaction with a twist. In the normal ABC transaction, A sells to B the working interest in producing oil and gas leases and retains a production payment—a right to oil and gas in place that entitles its owner to a specified fraction of production for a limited period of time or until a specified sum is paid. A then sells the retained production payment for a purchase price equal to its principal amount to C, who finances the purchase by a loan secured by a deed of trust and mortgage on the production payment and an assignment of the income accruing to the production payment. B then reports the income accruing to the working interest, and C reports that accruing to the production payment. *See, e. g.,* Bryant v. Commissioner, 46 T.C. 848 (1966), aff'd, 5th Cir. 1968, 399 F.2d 800; Appleman, The ABC Deal, Sw. Legal Foundation 11th Inst. on Oil & Gas Law & Taxation 519 (1960).[1]

According to the Commissioner, taxpayer's guaranty of the loan in the instant case is a twist which changes the nature of the interests created by the transaction. The Commissioner has determined that the income from the pro-

duction payment was taxable to taxpayer because he retained the ultimate risk of loss from nonproduction through his loan guaranty to First National and therefore had the "economic interest" in the production payment. The Tax Court sustained the Commissioner's determination.

■ The concept of "economic interest" originated as a test to determine what kinds of income derived from mineral production and sale were subject to depletion. Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933). It now also determines who is taxable on that income. Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277 (1940); Thomas v. Perkins, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324 (1937).

An analysis of the instant transaction's effect must begin with Thomas v. Perkins, *supra,* in which the Supreme Court for the first time, as far as we have been able to determine, considered the tax treatment to be accorded a reserved oil production payment. In *Perkins,* the assignor transferred to the taxpayer an oil and gas lease reserving a production payment to be paid out of 25 per cent of the oil produced on the lease. The agreement provided that the purchase price was "payable out of oil only * * * and said oil payment does not constitute and *shall not be a personal obligation* of the assignee * * *." (emphasis added) In holding that no part of the income allocated to the production payment should be included in the taxpayer's income, the Supreme Court stated:

The provisions for payment to assignors in oil only, the absence of any obligation of the assignee to pay in oil or in money, *and the failure of assignors to take any security by way of lien or otherwise* unmistakably show that

---

1. Congress, in the Tax Reform Act of 1969, eliminated the use of the ABC transaction in the purchase of oil, gas, and other mineral properties by adding section 636 (b), which provides that a retained production payment in the sale of mineral

properties is to be treated as a purchase money mortgage loan, and will not qualify as an economic interest in the mineral property. 26 U.S.C.A. § 636(b) (Supp. 1971).

they intended to withhold from the operation of the grant one-fourth of the oil to be produced and saved up to an amount sufficient when sold to yield [the purchase price].

301 U.S. at 659, 57 S.Ct. at 912–913 (emphasis added).

A contrary result was reached by the Supreme Court in Anderson v. Helvering, *supra,* a case differing factually only slightly from *Perkins.* In *Anderson,* Oklahoma Company sold the taxpayer certain oil interests for $50,000 cash and $110,000 to be paid from "one-half of the proceeds * * * derived from oil and gas produced from the properties *and from the sale of fee title* to any or all of the land conveyed." 310 U.S. at 405–406, 60 S.Ct. at 953 (emphasis added). The taxpayer paid the Oklahoma Company one-half of the lease proceeds as they were earned.

The second source of recoupment, emphasized above, caused the Court to distinguish the case from *Perkins.* In holding all lease proceeds to be taxable to taxpayer, the Court stated:

> The reservation of an interest in the fee, in addition to the interest in the oil production, however, materially affects the transaction. Oklahoma Company is not dependent entirely upon the production of oil for the deferred payments; they may be derived from sales of the fee title to the land conveyed. * * * We are of the opinion that the reservation of this additional type of security for the deferred payments serves to distinguish this case from Thomas v. Perkins. * * * In the interests of a workable rule, Thomas v. Perkins must not be extended beyond the situation in which, as a matter of substance, without regard to formalities of conveyancing, *the re-*
> *served payments are to be derived solely from the production of oil and gas.*

310 U.S. at 412–413, 60 S.Ct. at 956 (emphasis added).

The Supreme Court has utilized two concepts to determine who is the owner of a depletable and taxable "economic interest" in oil in place: The taxpayer must have (1) acquired, by investment, any interest in the oil in place, and (2) secured by legal relationship income derived from the extraction of oil, to which he must look for a return of his capital. Commissioner of Internal Revenue v. Southwest Exploration Company, 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956); Thomas v. Perkins, *supra;* Palmer v. Bender, *supra.* The second concept has been interpreted by the Supreme Court to mean that the taxpayer, in order to be taxable, must look *solely* to the extraction of oil or gas for a return of his capital. Commissioner of Internal Revenue v. Southwest Exploration Company, *supra;* Anderson v. Helvering, *supra.*

This Circuit has had occasion to follow these Supreme Court decisions in the past.[2] Recently, in Christie v. United States, 5th Cir. 1971, 436 F.2d 1216, taxpayers entered into a written oil payment contract with one Karrenbrock under which he agreed to furnish equipment in the aggregate value of $5,235.24 to be used on wells in the production of oil from the lease. Taxpayers in return conveyed to Karrenbrock an oil production payment payable out of 80 per cent of all the minerals produced in the interest owned by them until the market value of the minerals aggregated the sum of costs to be incurred by Karrenbrock in purchasing and installing the

---

2. *See, e. g.,* Rutledge v. United States, 5th Cir. 1970, 428 F.2d 347; United States v. Cocke, 5th Cir. 1968, 399 F.2d 433, cert. denied, 394 U.S. 922, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969); Wood v. United States, 5th Cir. 1967, 377 F.2d 300, cert. denied, 389 U.S. 977, 88 S.Ct. 465, 19 L.Ed.2d 472 (1967); United States v. Witte, 5th Cir. 1962, 306 F.2d 81, cert. denied, 371 U.S. 949, 83 S.Ct. 503, 9 L.Ed.2d 498 (1963).

equipment, plus a 5 per cent commission and 5½ per cent annual interest. The oil payment assignment also provided that:

> In the event that any equipment which has been furnished by * * * [Karrenbrock] is salvaged from the said leases above described, [Karrenbrock] may, at his option, elect to have the proceeds from the sale of any or all such equipment applied on the reduction of the oil payment herein reserved.

436 F.2d at 1218.

Taxpayers contended that Karrenbrock should have been taxed on the oil payment income as he had assumed the risk of nonproduction under *Perkins*. This Court found that the facts were more closely analogous to *Anderson* because Karrenbrock had the option to have the sale proceeds of any salvaged equipment applied in reduction of the oil payment and was thus not solely dependent upon production for payout. Taxpayers were thus held to have retained their economic interest in the oil allocable to the oil payment and were taxable for the income thereof.

In Commissioner of Internal Revenue v. Estate of Donnell, 5th Cir. 1969, 417 F.2d 106, which closely resembles the instant case with one significant difference, this Court, following *Anderson*, held the owner of mineral interests, rather than the production payment holder, taxable on production payments where the mineral interest owner's *sole* source for a return of his investment was production. In *Donnell*, Fleming assigned to taxpayer all his interest in oil and gas leasehold production in a certain area and reserved a production payment of $35,275 plus interest at 6½ per cent per annum on the unrecovered balance payable out of 85 per cent of all minerals produced from the assigned properties.

Fleming sold the production payment to the Calm Corporation for $35,275. The Calm Corporation borrowed the same amount from the bank in order to finance the purchase, and as security for the loan gave the bank a deed of trust conveying the production payment to a trustee of the bank. Taxpayer simultaneously agreed by letter that he would, if requested, purchase the unpaid balance of the Calm Corporation note from the bank or the unliquidated balance of the production payment from Calm Corporation. Taxpayer was never requested to make either purchase, and the production payment was paid out in full from the lease proceeds before the note became due.

The Court found that the purpose of the taxpayer's "take-out" letter was expressed as an inducement to the Calm Corporation to purchase the production payment from Fleming and as an inducement to the bank to loan Calm Corporation the funds with which to purchase the production payment. It was further found that *this guaranty insulated both the bank and Calm Corporation from any loss* which might occur if lease production was insufficient to liquidate the production payment. Thus neither the bank nor Calm looked *solely* to the oil production for a return on their investments; each could look to taxpayer. As a result, under the *Perkins-Anderson* rationale, neither Calm nor the bank had an "economic interest" in the mineral deposit. Instead, taxpayer had clearly acquired the economic interest by his guaranty and was thus chargeable with all income from the lease.

The Commissioner argues in the instant case that through his "take-out" letter taxpayer retained the investment risk with respect to the production payment and that, therefore, the economic interest was not transferred. The income accruing to the production payment would thus belong to taxpayer under *Anderson* and *Perkins*. Taxpayer contends that the *Perkins* rule does not apply because of his retaining the right of subrogation against G & W. This, he alleges, provides him with an alternative means of recovery, which distinguishes the instant case from *Perkins* and *Donnell*, and places it squarely with-

in the *Anderson* [3] and *Christie* rationale. Taxpayer further contends that the ultimate risk of nonproduction falls on G & W under Landreth v. Commissioner of Internal Revenue, 50 T.C. 803 (1968), a case involving a virtually identical fact situation. We agree that *Landreth* is dispositive of the instant case.

In *Landreth,* taxpayer sold working interests in oil and gas leases to one Anderson, retaining production payments which he then sold to Petroleum Investors Ltd. (Investors). Investors financed the purchase by a bank loan, which was induced by the taxpayer's promise that if requested to do so upon maturity of the note, he would find a purchaser for the note, or purchase it himself, for a sum equal to the unpaid balance plus accrued interest.

The Commissioner argued that Investors was a mere strawman, and that the bank was the real holder of the production payment. Since Landreth guaranteed the loan by the bank, the holder of the production payment had additional security. Therefore he reasoned that *Anderson* and *Donnell* applied because no economic interest was transferred by Landreth to Investors or the bank. The investment risk therefore remained with Landreth, and the income accruing to the production payment was taxable to him.

In response, the Tax Court held:

Contrary to the respondent's contention, we conclude that the ownership of and the economic interest in, the production payment passed to Investors as a result of the transaction. After the transfer, Investors bore the ultimate risk of loss from failure of production from the transferred leases to satisfy the production payment. In the first place, Investors was not a mere strawman; there was uncontradicted testimony, and we have found, that Investors had a net worth of

greater than $300,000 in August 1961. Investors' liability on its note to the Midland Bank was general—it was not limited to the production payment. Althought the Midland Bank agreed to make the loan without realizing that Investors had substantial assets, the bank actually had a meaningful right to shift any loss on the production payment to Investors.

It is true, as the respondent points out, that if the Midland Bank found its security interest in the production payment insufficient to protect itself from loss on its loan to Investors, it could look to Mr. Landreth to fulfill the terms of his takeout letter. However *the fact that Mr. Landreth might have a guarantor's obligation to the Midland Bank is not sufficient to establish that he had the economic interest in the production payment.* Having purchased the note, Mr. Landreth, or someone found by him pursuant to the terms of the takeout letter, would step into the shoes of the Midland Bank as a creditor of Investors, and have a right against Investors for the unpaid balance plus interest on the note. *In view of the facts that the purchaser of the note would have a right against Investors and that Investors had sufficient net worth at the time of the transactions to make the right meaningful, we find that the takeout letter did not cause the economic interest to remain with Mr. Landreth;* the investment risk lay upon Investors.

50 T.C. at 809–810. (Emphasis added)

The Commissioner relies heavily on the *Landreth* court's specific finding that Investors had financial substance. The Tax Court there admittedly made it clear that,

Our reasoning and holding herein are based on our factual determination that Investors was a financially re-

---

3. Both the Commissioner and taxpayer rely on *Anderson*. The Commissioner argues that taxpayer in the instant case is analogous to the taxpayer in *Anderson*;

whereas taxpayer argues that he is in the same position as that of Oklahoma Company in *Anderson*.

sponsible party. Had Investors been a shell, we would have a different case, as to which we express no views at this time.

50 T.C. at 809 n.2.

The Commissioner would infer from this language that such a finding of financial responsibility is necessary in all cases involving ABC transactions in which a determination of "economic interest" depends upon the existence of a right of subrogation. The taxpayer would thus have the burden of proving that the debtor was solvent and financially able in all such cases.[4]

We can glean no such holding or inference from Landreth. It is clear to us at least that the Tax Court, in speaking of Investors' net worth, was only attempting to buttress its finding that the Commissioner had not met his burden of proving that the subrogation transaction was a sham. This can be seen from the Tax Court's discussion of Estate of Ben Stone v. Commissioner of Internal Revenue, 50 T.C. 113 (1968) a case clearly involving the Commissioner's failure to meet his burden of proof in such a situation:

The inapplicability of Anderson and Donnell to this situation was also indicated by the recent decision of this Court in Estate of Ben Stone. * * * That case involved a variant of the ABC transaction * * *. A (Hal-

bouty) sold undivided interests in oil and gas leases and in equipment used in working the leases to C (Scripps), who financed the bulk of the purchase price through a bank loan. As security, the bank took a deed of trust on all of the property acquired by C in the transaction. C then sold the working interest to B (Sango), retaining a production payment. The respondent took the position that B was taxable on the production payment income. He argued that C was a strawman and that the "production payment ran from Sango to the bank and that the existence of the deed of trust [which covered property other than production payment oil] gave rise to an additional security which under the rule of Anderson v. Helvering, * * * prevented the production payment from being a depletable economic interest." * * *

However, the Court found that the respondent, who had the burden of proof in that case, had failed to prove that Scripps lacked substance. It held that the purchaser of the working interest was taxable only on the income accruing to that interest, notwithstanding that the bank had a lien against the entire property to secure its loan.

50 T.C. at 811–812 (emphasis added).

4. The Tax Court earlier made this quite clear:

In the instant case, beyond the bare stipulation that neither of the petitioners, individually or jointly, had any ownership or proprietary interest in G & W, we have no evidence whatsoever as to whether G & W had an interest in the transactions involved herein substantively independent of the interests of First National or petitioner * * *. Nor do we have any evidence that it had any assets at all which might have provided some content to petitioners' legal right of subrogation. Concededly, the evaluation of financial responsibility in the broad sense of ability to pay is an extremely troublesome one, and the applicability of such a criterion would, in any event, have limited appli-

cability in light of recent legislation. How far we should go in this direction, we leave to resolution at a later date, if that should become necessary. For the purposes of this case, it is sufficient to note that petitioners have not even attempted to satisfy their burden of proof as to ultimate risk of loss with a minimal amount of evidence * * *, although it is apparent from the oral argument at the time of submission of the case and petitioners' original brief that their counsel was well aware of the existence of the issue of economic reality.

We cannot on the record before us conclude that petitioner did not bear the ultimate risk of loss.

54 T.C. at 1620–1621.

This is not inconsistent with the interpretation previously put on *Landreth* in this Court. In *Donnell* this Court stated:

> In *Landreth* the assignor of a production payment guaranteed its payment to the bank financing the purchase of the production payment. However, the court specifically found that the buyer of the payment was ultimately liable, through subrogation, to the vendor for payment if production failed and the bank sued on the vendor's guaranty. Hence, it was held that the purchaser and not the vendor was chargeable with the income from production. That decision conflicts in no way with our decision here. In both cases the income is allocated to the person who looks *solely* to production to recoup his capital investment, stands the risk of loss, and who, therefore, holds the economic interest in the oil in place.

417 F.2d at 115–116. We did not then consider proof of solvency or financial stability to be a limitation on the clear holding of *Landreth*, and we can see no valid reason for so holding at this time.[5]

The courts have in many cases upheld the position that the substance of a transaction prevails over form for Federal income tax purposes. *See, e. g.*, Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). The Supreme Court in Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940), for example, denied a loss deduction on a sale to a wholly-owned subsidiary, stating that transactions made solely to reduce tax liability "which do not vary control or change the flow of economic benefits, are to be dismissed from consideration." 308 U.S. at 476, 60 S.Ct. at 357. Likewise, in Griffiths v. Helvering, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319 (1939), in which an individual was taxed on income from a transaction in which a corporation acted as a conduit, the Court stated:

> We cannot too often reiterate that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." (Citations omitted) And it makes no difference that such "command" may be exercised through specific retention of legal title or the creation of a new equitable but *controlled* interest, or the maintenance of effective benefit through the interposition of a subservient agency.

308 U.S. at 357–358, 60 S.Ct. at 278.[6]

■■ The mere transfer of bare legal title to property is not enough to constitute a "sale" for income tax purposes if the transferor continues to exercise virtually all his former control, and stands in the same economic position as he did prior to the transfer. *See* Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940); Helvering v. F. & R. Lazarus and Co., 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939); Shaw Construction Co. v. Commissioner of Internal Revenue, 9th Cir. 1963, 323 F.2d 316. This principle is recognized in the oil and gas area as well. A sale and lease-back of mineral properties between

---

5. No such distinction or limitation was recognized in *Christie*, as this Court stated:

> Taxpayers contend by analogy that inasmuch as the personal guaranty of the holder's loan [in *Landreth*] was not considered an "alternative source," it follows that the equipment furnished by Karrenbrock should not be considered so. In *Donnell*, we saw no conflict with *Landreth*, noting that the Tax Court found that if production failed and the bank sued on Landreth's guaranty, Petroleum Investors, Ltd. was ultimately liable, through subrogation, to Landreth, 417 F.2d at 115. [In *Donnell*, the guaranty ran to Calm Corporation, C's counterpart, as well as to the bank.] Here again, we see no conflict. To the contrary, as in *Landreth*, the party bearing the risk of nonproduction is chargeable with the income from production. 436 F.2d at 1221 n.7.

6. *See also* United States v. Cocke, 5th Cir. 1968, 399 F.2d 433; Callahan Mining Corp. v. Commissioner, 51 T.C. 1005 (1969), aff'd 2d Cir. 1970, 428 F.2d 721.

a parent corporation and its wholly-owned subsidiary to enable the parent to benefit from the allowance of both cost and percentage depletion is disregarded for Federal income tax purposes. Rev. Rul. 68–430.

 The grant of a subrogation right, like a sale in the ordinary commercial sense, connotes a genuine economic transaction, effecting a change in the economic relationship between the parties and the property.[7] A right of subrogation, if given without any real substance and with an intent only to inherit tax benefits resulting, would hence be given no effect by this Court. The burden of proving that such transactions are in reality a sham or lacking in substance is on the Commissioner, not the taxpayer. The taxpayer must only prove that the subrogation right exists in order to claim a lack of economic interest in the oil in place under *Landreth*. In Estate of Ben Stone v. Commissioner of Internal Revenue, 50 T.C. 113 (1968), the facts of which have previously been stated, the Tax Court stated:

> [T]he burden of proof is upon the respondent. Though, with respondent, we are prone to view with some skepticism a transaction of this nature, we do not think that this alone is sufficient to satisfy his burden of proof. As far as we are able to ascertain from this record, Scripps is in no way related to Sango or the

Stones and is not financially interested in the former. Neither does the record indicate that Scripps acted as an agent for either Halbouty or Sango.

We agree with respondent that the overall result of the transactions effective October 1, 1958, was to enable Sango ultimately to acquire the entire interest in the properties for a relatively small present investment, the balance being "financed" by way of the oil production. From what sources we have been able to find, however, this same statement can be made about every transaction in which an oil payment is utilized, including the transfer described in Thomas v. Perkins, *supra*. In fact, it is a recognition of this reality that has caused this Court to be reluctant to extend the benefit of this type of transaction to other areas of the law * * *.

50 T.C. at 123–124.

 We are aware of no valid reason to alter the burden of proof in the instant case by requiring the taxpayer, in reality, to prove his transaction was *not* a sham. Surely it cannot be inferred solely from the fact that a tax advantage will be reaped from it that the subrogation right was given for tax reasons only and was without substance. Without proof that the debtor in such cases was controlled by the taxpayer, or in some other condition or circumstances indicating a lack of substance to the tax-

---

7. The similarities between the sale and subrogation situations were recognized by the Tax Court in *Landreth*:

> *The issue in this case may also be stated as whether or not the purported transfer of the production payment to Investors was in substance a "sale."* We have found that, as a result of the transaction, the investment risk was transferred to Investors. Mr. Landreth received full payment for the sale of his interest. He did guarantee the loan and as a result incurred some risks, but those risks were not significantly different from those he would have retained had he sold the production payment on credit; that is, had Investors paid for the production payment by giving Mr. Landreth its ∂emand note for

the purchase, secured by the production payment and Investors' personal liability, Mr. Landreth would have been exposed to at least as much risk as he actually was, acting as guarantor for the bank. Yet, it would follow *a fortiori* from Commissioner of Internal Revenue v. Brown, 380 U.S. 563, (85 S.Ct. 1162, 14 L.Ed.2d 75) (1965), that such a sale on credit would be recognized as a sale for tax purposes. The seller in such a case would have greater security, and therefore less risk, than the seller in *Brown*. As the credit sale would be recognized for tax purposes, so should the sale actually before. *Brown* requires us to hold that this sale was effective.

50 T.C. at 812 (emphasis added).

payer's right of subrogation, we do not think the Tax Court is at liberty to so find. Credit purchases and the granting of subrogation rights, like sales, are commonplace in our economic system. They are so ordinary that we are not willing to presume them to be shams or lacking in economic reality without affirmative proof. We instead presume ordinary contract rights to have value in the absence of contrary proof.

The only reason the Tax Court could possibly have had in requiring proof of financial responsibility in such cases was to avoid the possibility of tax avoidance through the granting of sham subrogation rights. We can see no distinction between subrogation cases and those involving outright sales. In both situations the burden of proof remains on the Commissioner to prove the lack of substance.[8]

We therefore reverse and remand for judgment to be entered in favor of appellant.

TUTTLE, Circuit Judge (dissenting).

I respectfully dissent.

I am of the opinion that in order to prevail in this case the taxpayer was required to prove not only that he would have enjoyed a legal right of subrogation to the claims of the bank over and against G & W Corporation, but that such right had *value* as well, in short, that G & W Corporation had some economic substance. Since taxpayer introduced no evidence on the question of value, I would affirm the decision of the Tax Court.

It is, of course, well-established that, with a few exceptions, the burden of proof in tax cases is on the taxpayer.

This general principle has been incorporated into the Tax Court Rules, specifically Rule 32 which provides that "(t)he burden of proof shall be upon the petitioner, except as otherwise provided by statute, and except that in respect of any new matter pleaded in his answer, it shall be upon the respondent." This burden is ordinarily placed on the taxpayer because any original deficiency determination by the Commissioner of Internal Revenue carries a presumption of correctness, Commissioner of Internal Revenue v. Smith, 285 F.2d 91 (C.A. 5 1960) and such a determination is deemed to be prima facie evidence of the amount due as taxes, establishing a prima facie case of liability against the taxpayer. To overcome this presumption the taxpayer must introduce evidence sufficient to make a prima facie showing that the Commissioner has erred; such a showing must cover *all* elements necessary to establish the allegations in the taxpayer's petition. See, e. g., Standard Marine Insurance Co., Ltd., 4 B.T.A. 853. The problem then, where sufficiency of proof is at issue, becomes one of identifying exactly what elements the taxpayer must prove in order to defeat the presumption of correctness which attaches to the Commissioner's original deficiency determination. That is the problem in the case before us.

The taxpayer here was called upon to establish that he did not retain an economic interest in the production payments sold to G & W Corporation.[1] Under the law pertaining to ABC transactions, as detailed in the majority opinion, he was required to prove that he did not look solely to oil production for a return of his investment or otherwise

---

8. Because the Commissioner has not offered proof of G & W's lack of substance in the instant case, we need not determine whether proof of debtor's lack of financial responsibility, in and of itself, under the limitations of Commissioner of Internal Revenue v. Brown, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965), and Crane v. Commissioner of Internal Revenue, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed.

1301 (1947), could ever be sufficient to prove that a transaction was a sham purposed to avoid tax liability, rather than one effecting a genuine change in economic relations.

1. The majority recognizes that the burden of proof, in the first instance, had to be carried by the taxpayer; however, they contend that this burden was fully met by proof of the potential right of subrogation.

stated, that he did not bear the ultimate risk of loss should oil production fail. This necessarily entailed a showing that the taxpayer had a source other than oil production from which he could recoup his investment *and* that such other source had economic substance. That proof of economic substance was an indispensable element to taxpayer's case should be obvious. In tax matters it is repeatedly emphasized that the courts are obliged to concern themselves with economic reality and to disregard mere form.

In this case the taxpayer has proven only that he would have had a legal right of subrogation over and against G & W Corporation in the event that he had been called upon to make good on his takeout letter to the bank. This, it seems to me, establishes only that he had an alternate source, but not that he could realistically look to the source for an actual return of the money used to pay off the bank. The relevant legal test for determining who holds the economic interest in oil in place (which necessarily corresponds to the taxpayer's burden of proof) has *two* elements, i. e., that (1) the taxpayer have a source other than oil production (2) to which he can look for a return of his capital. Conceding that the taxpayer has adequately established the first element, it is nonetheless clear that he has failed to prove the second. The second could be established only by a showing that G & W Corporation had economic substance and that, as a consequence, looking to it for a return of capital was meaningful in a financial sense.

That proof of economic substance in G & W Corporation was a necessary element in taxpayer's proof is made even clearer when viewed from the opposite perspective, that is, did taxpayer bear the ultimate risk of loss? It is to be noted that a naked legal right of subrogation has no intrinsic value. Here such a right would have value only to the extent that G & W Corporation had economic substance. If the debt created by the right were uncollectible because

G & W Corporation lacked financial substance, then the taxpayer here would indeed have borne the risk of loss had he been forced to take up G & W Corporation's note. Thus to establish that he did not bear the risk of loss (and with it the economic interest) taxpayer must demonstrate that his right of subrogation was more than a naked legal right, in short that the right was valuable because G & W Corporation was a viable corporate enterprise. That was the taxpayer's burden and he has failed to carry it.

The majority's reliance on Estate of Ben Stone, 50 T.C. 113 (1968) in support of the proposition that the burden was on the Commissioner to prove that G & W Corporation lacked substance, is, I submit, misplaced. It is true, of course, that in the Ben Stone case the burden of proving lack of substance was on the Commissioner, but *only* because the Commissioner raised the issue for the first time in his responsive pleading. This is a specific exception to the general rule, i. e., the burden of proof is on the taxpayer "except that in respect of any new matter pleaded in his answer, it shall be upon the respondent." (Tax Court Rule 32). This exception is grafted on to the general rule because the presumption of correctness attaches only to the original deficiency determination and thus if the Commissioner chooses to plead new matter in his answer, that new matter does not carry a presumption of correctness and the Commissioner must therefore bear the burden of proving it. The "new matter" exception, of course, cannot apply here because nothing new was pleaded in the Commissioner's answer. Thus the Commissioner enjoyed his customary presumption of correctness, and the taxpayer was required to prove the existence of some source, having value, to which the taxpayer could look for the return of his capital investment.

Moreover, requiring the taxpayer to prove substance in G & W Corporation is not, as the majority suggests, a matter of forcing him to prove a negative propo-

sition, i. e., that the transaction was *not* a sham. Rather *proof of substance* is an affirmative element of the taxpayers case, to wit, that he had a valuable source, other than oil production, to which he could look for a return of his investment.[2]

Particularly where ABC transactions are concerned, we should be quick to slice through form to find the economic realities. In failing to prove that the right of subrogation was financially meaningful, taxpayer has also failed to establish that the economic interest in the production payments was effectively transferred to G & W Corporation.

For the foregoing reasons I would affirm the decision of the tax court.